Jason N. GATES *v*. STATE of Arkansas

CR 98-1197 2 S.W.3d 40

Supreme Court of Arkansas
Opinion delivered September 16, 1999

532

*Arkansas Public Defender Commission,* by: *Mac J. Carder, Jr., Betsy Johnson,* and *Scott Bles,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Kent G. Holt,* Ass't Att'y Gen., for appellee.

LAVENSKI R. SMITH, Justice. The appellant, Jason N. Gates ("Gates"), raises three points in his appeal of a capital murder conviction. Following conviction, the jury sentenced Gates to life imprisonment without parole. First, Gates argues that the Prosecuting Attorney made improper statements during closing arguments, including a veiled reference that Gates should have testified in his own defense during trial. Second, Gates argues that the trial court erred in allowing the admission of certain evidence suggesting that the victim had been sexually assaulted despite the fact that Gates had not been charged with any sexual offense. Finally, Gates argues that the trial judge should have recused because a relative to a potential witness in the case worked for the judge, and, prior to the murder, the judge conducted a guardianship hearing involving the victim. We disagree and affirm on all points.

*Facts*

On December 10, 1996, an intruder murdered Zena Mae Petty, an eighty-year-old resident of England, Arkansas, in her home. Lisa Elliot, Petty's aide, arrived at Petty's residence at approximately 8:45 a.m. that morning to pick up Petty and assist her with errands. Upon arrival, Elliot discovered the backdoor to the house partially opened. Elliot assumed that Petty must have previously opened it that morning, so she entered the house. Elliot walked down a hallway and into the family room, and noticed the house had been ransacked and the front door was broken apart and ajar. Eliot also noticed that the house was cold although Petty usually kept it fairly warm. Fearing something was wrong, Elliot left the house, obtained help from neighbors Quinn and Molly Melton, and together they reentered the house to find Petty. The group made its way to Petty's bedroom located in the rear of the house where, upon seeing Petty's legs at the foot of her bed, immediately exited the house and called the England Police Department. England Police Officer Nathan Cook arrived first, and secured the house as a crime scene. Cook and another England police officer then reentered the house and discovered Petty's body on her bed in her bedroom.

Local authorities began a homicide investigation. England police called the Arkansas State Police for further investigative support. Soon thereafter, the Arkansas State Police arrived and began conducting a crime scene search of the premises. State Police officers lifted fingerprints from many surfaces, took blood samples, and searched the premises for any other physical evidence which might be present. The police identified what appeared to be shoe prints in blood on the floor. They also found gloves on the floor inside the home. Outside, the police found a screwdriver and a set of kitchen shears thrown in a nearby ditch. The police took all these items into evidence.

As the investigation proceeded, Jason Holt ("Holt"), a local juvenile, then age sixteen, met with Gates at the Git-N-Go Express convenience store in England. According to Holt they met at approximately noon on December 10. Holt knew Gates fairly well because Gates had previously dated Holt's cousin.

Later, Holt testified that during this meeting Gates told him "I hit a lick." Gates then accompanied Holt to Holt's grandmother's house. There, according to Holt, Gates explained that he had robbed Zena Petty. Gates told how he "hit her four times" because she bruised his arm with a cane. Holt then stated that Gates showed him jewelry he had taken from Petty's house, and told him where he had hidden other jewelry. Initially, Holt did nothing about reporting the crime. However, later that afternoon, as the young men were riding in a car with another friend, Bryan White, the pair learned from White that Petty had been found murdered. White testified at trial that Holt, upon hearing this information, seemed upset at the news.

Holt testified that after he left Gates's and White's company, he met with a friend, Rodney Spradlin, and asked for his advice about reporting the crime. Holt, himself, had previously committed several criminal offenses. Rodney Spradlin took Holt to Calvin Spradlin, Rodney's father, who advised Holt to report what he knew to the police. At approximately 5 p.m. on December 10, Holt went to the England Police Department to report what he had been told about the crime. Subsequently, Holt accompanied an England police officer to the places Holt said that Gates told him that Gates had hidden the jewelry in a sock. The police investigator found a sock with jewelry in it in a place consistent with where Holt directed him to look. The England police officer then called in the State Police investigators who retrieved the sock for evidence. Holt also told officers that Gates had some clothes over at his house, and that Gates had changed pants there, but not shirts. The police then went to Holt's house and retrieved a pair of Gates's pants for testing.

Later that evening after taking Holt's statement, the police picked up Gates for questioning. During questioning, the police asked for Gates's shoes, and Gates then took off and handed the shoes to the questioning officer. The officer, at that time, noted that Gates was not wearing socks. During questioning, Gates told officers that he had been with Tony and Terry Oswalt the night before. Gates claimed that on December 9, 1996, he and the Oswalts rode around and bought and drank beer late into the evening. Terry Oswalt later testified at trial that he let Tony and

Gates off at Tony's house at the end of the evening, and that Tony and Gates went inside to watch the last of a Monday night football game. Tony Oswalt testified that, after the game, Gates left his house to "sleep at his [Gates's] sister's house." Tony testified that at approximately 2:30 a.m., he heard knocking on a window, and Gates reappeared and asked whether he could sleep on Oswalt's couch. Tony let him in and went back to bed. When Tony awoke the next morning at approximately 7:00 a.m., he said that Gates had already left his house.

The evidence collected at the crime scene and from Gates's shoes and jeans revealed that a latent fingerprint lifted from the deadbolt lock on the back door in the garage at Petty's house belonged to Gates. Further evidence revealed that blood specks found on Gates's shoes and jeans, matched through DNA testing, was Petty's blood. The kitchen shears and screwdriver found in a ditch near Petty's house turned out to be Petty's, and the shears had Petty's blood on them.

At trial, Gates's mother testified in his defense that on the morning of December 10, 1996, when she saw Gates at the Laundromat, she confronted him about not wearing the expensive tennis shoes she had purchased for him. He was wearing combat boots at the time. He justified not wearing his tennis shoes by explaining that his tennis shoes had gotten wet from a water hose. He said he left the shoes and the jeans at Holt's house days before. His sister, Penny Parker, also testified that she noticed the boots. At the close of the case, the jury returned a guilty verdict on the capital murder charge and sentenced Gates to life in prison without parole, declining to impose the death penalty.

### Closing arguments

Gates's first argument on appeal is that the trial court committed reversible error by allowing the prosecutor to make two comments, to which Gates objected, during closing arguments. Gates characterizes the first comment as a veiled reference that Gates failed to testify. Such a comment would be a violation of Gates's rights under the Fifth and Fourteenth Amendments of the United States Constitution as well as the Arkansas Constitution.

The other comment made by the prosecutor to which Gates objects involved the prosecutor's characterization of the testimony of one of Gates's witnesses, calling that person's testimony a "lie."

Regarding the alleged reference to Gates's failure to testify, the Prosecutor made the following statement during closing arguments:

> PROSECUTOR: He [appellant] entered or remained unlawfully in order to commit an offense punishable by imprisonment, to-wit, a theft to deprive somebody, to take something from somebody else. The pantry was opened. A towel is there on another handle. But, at some point, and we do not know, but he does, he knows—.

> DEFENSE COUNSEL: Ask to approach, Your Honor. (*At the bench.*) Your Honor, I object to the prosecutor saying only the defendant knows, implying that he did not testify in this case. I would ask for a mistrial at this time.

> PROSECUTOR: I am not implying anything. I am saying he is guilty and he knows.

> DEFENSE COUNSEL: When he says that he knows, that gives—.

> COURT: He is not alleging that. The Court has give the instruction that the fact that he did not testify is not to be considered in any way.

> DEFENSE COUNSEL: That is correct. The instruction was given. But, by him saying only he knows, he is implying that he knows and that he has failed to testify. I renew my objection for a mistrial.

> COURT: Denied.

> PROSECUTOR: Your Honor, may I rephrase it, "He knows because he is guilty."?

> COURT: Sure.

> PROSECUTOR: Okay. (*Bench Conference Concluded.*) He knows because he is guilty and because he did this.

■ ■ As noted, Gates moved for a mistrial on this matter at trial, and the trial court denied it. As a preliminary note, mis-

trial is an extreme remedy and is proper only when an error is so prejudicial that justice cannot be served by continuing the trial and when it cannot be cured by an instruction. *Williams v. State*, 338 Ark. 178, 992 S.W.2d 89 (1999). The decision to grant a mistrial is within the sound discretion of the trial court, and will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Reel v. State*, 318 Ark. 565, 886 S.W.2d 615 (1994); *King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994).

■ In reviewing whether a comment made by a prosecutor during closing arguments is an impermissible comment on a defendant's failure to testify, a two-step process is involved. First, we determine whether the comment itself is an improper comment on the defendant's failure to testify. The basic rule is that a prosecutor may not draw attention to the fact of, or comment on, the defendant's failure to testify, because this then makes the defendant testify against himself in violation of the Fifth Amendment. *See Chapman v. California*, 386 U.S. 18 (1967); *Landreth v. State*, 331 Ark. 12, 960 S.W.2d 434 (1998). A veiled reference to the defendant's failure to testify is improper, as well. *Landreth, supra; See also Bradley v. State*, 320 Ark. 100, 896 S.W.2d 425 (1995).

■ ■ Should we determine that the prosecutor's closing argument statement did indeed refer to Gates's choice not to testify, we would then determine whether it can be shown beyond a reasonable doubt that the error did not influence the verdict. *Griffin v. California*, 380 U.S. 609 (1965)(citing *Chapman, supra*). Here, defense counsel characterizes the prosecutor's comment as a "veiled" reference to Gates's choice not to testify. We disagree. A careful examination of the statement in context reveals that the prosecutor's statement asserts only that Gates, as the perpetrator of the crime, had knowledge of his actions. It did not go further and imply anything regarding Gates's election under the Fifth Amendment not to testify. Also, the jury had already been instructed, prior to closing arguments, that Gates did not have to testify at trial, and his choice not to testify could not be considered against him. We hold that the trial court did not abuse its discretion in not granting Gates's request for mistrial.

Gates also argues on appeal that the prosecutor improperly commented on the veracity of one of Gates's witnesses, Norma Stephens, who testified about statements that Gates, her son, had made to her regarding his whereabouts the night of Petty's murder. In commenting on the defense's testimony during his closing argument, the prosecutor stated, "It is not just Jason Holt. If you just look at Jason Holt then you do not have that there was a lie as far as where he stayed that night, at Tony Oswalt's. There was a lie even from Norma Stephens. And I would say this, there are not any inconsistencies in his witnesses' testimonies." Gates counsel objected, stating, "He is labeling them as a liar from the witness stand. He is invading the province of the jury on evaluating the evidence in this case." The trial judge overruled Gates's objection to this statement on the grounds that the prosecutor had not impermissibly characterized Stephens as a liar.

In response, the State argues in its brief that two versions of the events of that night were presented at trial — the State's version, with Tony Oswalt testifying that Gates left his house for several hours during the night, and Gates's version, presented through hearsay testimony by his mother, that Gates had spent the entire night at Oswalt's house. In essence, the State argues that only one of the versions is true, and therefore someone had to have been lying.

Few of our cases deal with a prosecutor making a statement during closing arguments regarding the veracity of a witness's testimony. In *Harrison v. State*, 276 Ark. 469, 637 S.W.2d 549 (1982), a prosecutor vouched for the veracity of one of his witnesses during closing arguments. Upon the defendant's objection and motion for mistrial, the court denied the motion for mistrial and admonished the jury, pointing out that statements made by counsel were not evidence and should not be regarded as such. On appeal, we noted that the proper test was whether there was a manifest abuse of discretion by the judge in failing to act properly in the matter. The court determined that there had not been an abuse of discretion.

In *Cook v. State*, 316 Ark. 384, 872 S.W.2d 72 (1994), the defendant objected to a characterization of a witness's testimony,

arguing that the prosecutor was questioning the veracity of a witness. We disagreed and held that the characterization was more of an attempt to shift the burden of proof, and that an instruction by the trial court remedied that wrong.

In *Trimble v. State*, 316 Ark. 161, 871 S.W.2d 562 (1994), the defendant argued that the trial court abused its discretion in refusing to grant a new trial due to prosecutorial misconduct. In that case, the defendant argued that the prosecutor labeled the defendant's testimony as "hogwash" and a "lie" in one instance, but then used the statement as truth at a subsequent trial of another man charged in the crime. We held that the prosecutor was under no duty to judge the veracity of witnesses when using their testimony, and allowed the statement to come in.

██ ██ A trial judge is given broad discretion to control counsel in closing arguments, and this court does not interfere with that discretion absent a manifest abuse of it. *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995). Looking specifically at the statements in the instant case, we hold the trial judge did not abuse his discretion in permitting the statements. We also note that Gates did not request a curative instruction to the jury following his objection.

### Admission of evidence at trial

In his next point on appeal, Gates argues that the trial court committed reversible error by admitting evidence which he contends indicated that Petty may have been sexually assaulted. The evidence consisted of a photograph, a hair sample, and police testimony. This issue originally arose during pretrial conferences. The original criminal information filed against Gates the day after the murder alleged that he had committed a sexual assault against Petty during the commission of the burglary and murder. After the original prosecutor recused, the new prosecutor amended the information and dropped the charge of sexual assault. Given this amendment, Gates requested that the trial court forbid mention or evidence of a sexual assault at trial as it would prejudice his case. The trial judge, by pretrial order, required the prosecutor to

approach the bench before eliciting any testimony regarding a possible assault since that had not been alleged in the information.

Gates contends that during trial the court erred in three instances where it permitted the prosecutor to introduce prejudicial material. First, Gates objects to the trial court's admission of a photograph of the crime scene because he argues that it was highly suggestive. The picture depicts Petty's body on her bed, with her nightshirt raised to her abdomen, with her lower torso and legs completely uncovered. Gates argues that the photo suggested to the jury that Petty had suffered a sexual assault during the commission of the burglary and murder. Officer Cook and the other investigating officers described this scene as what they first saw when they entered Petty's room. Upon Gates's objection, the trial court allowed the picture into evidence as showing a complete view of the original crime scene. It was the only picture if its kind admitted into evidence.

■ ■ Admission of photographs is a matter within the sound discretion of the trial court, and will not be reversed absent an abuse of that discretion. *Jones v. State*, 329 Ark. 62, 947 S.W.2d 339 (1997). In *Jones*, we quoted *Camargo v. State*, 327 Ark. 631, 940 S.W.2d 464 (1997), regarding the admission of photographs, wherein we stated:

> We have often stated that the admission and relevancy of photographs is a matter within the sound discretion of the trial court. *Robinson v. State*, 269 Ark. 90, 598 S.W.2d 421 (1980). Although highly deferential to the trial court's discretion in these matters, this court has rejected a *carte blanche* approach to admission of photographs. *Berry v. State*, 290 Ark. 223, 227, 718 S.W.2d 447, 450 (1986). We have cautioned against "promoting a general rule of admissibility that essentially allows automatic acceptance of all photographs of the victim and crime scene the prosecution can offer." *Id.* at 228, 781 S.W.2d at 450. This court rejects the admission of inflammatory pictures where claims of relevance are tenuous and prejudice is great, and expects the trial court to carefully weigh the probative value of photographs against their prejudicial nature. *Id.* at 228-29, 781 S.W.2d at 450.

> We require the trial court to first consider whether such evidence, although relevant, creates a danger of unfair prejudice, and

then to determine whether the danger of unfair prejudice substantially outweighs its probative value. *Beed v. State*, 271 Ark. 526, 609 S.W.2d 898 (1980). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403.

Even the most gruesome photographs may be admissible if they tend to shed light on any issue, to corroborate testimony, or if they are essential in proving a necessary element of a case, are useful to enable a witness to testify more effectively, or enable the jury to better understand testimony. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Other acceptable purposes are to show the condition of the victim's bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. *Harvey v. State*, 292 Ark. 267, 729 S.W.2d 406 (1987). Of course, if a photograph serves no valid purpose and could only be used to inflame the jury's passions, it should be excluded. *Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986). The same guidelines that apply to photographs also apply to videotapes. *Hickson v. State*, 312 Ark. 171, 847 S.W.2d 691 (1993).

 In this case, the trial court admitted the photograph to show the position of the body when it was found, and because it was a full view of the unmodified crime scene. According to our precedents, this is a valid and appropriate reason to admit the photograph. At the time of its admission, the jury had not been given any information implying that Petty had been sexually assaulted. The trial judge balanced the photograph's probative value and any potential prejudice to Gates, then chose to resolve the matter in favor of its admission. The trial court did not abuse its discretion in doing so.

Second, Gates argues that the admission of testimony that the police took pubic-hair samples prejudiced him. It, too, he contends implied that Petty had been sexually assaulted. While Gates argues on appeal that he properly objected to the admission of the evidence, upon review of the record, we disagree. It is evident that Gates did not object to evidence of the taking of the pubic-hair samples when it was first mentioned by Investigator Scott Strickland of the Arkansas State Police. Investigator Strickland, who testified on three different occasions at trial, originally testified on February 16, 1998. In his testimony, Strickland noted that

one of the pieces of evidence obtained in the course of the investigation was twenty-five pubic hairs obtained from the defendant. The defense did not object. However, when Investigator Strickland testified the second time on February 18, 1998, defense counsel objected to Investigator Strickland mentioning that pubic-hair samples had been taken. The trial court denied this objection, finding that the prosecution could introduce the evidence to show that the police conducted a proper investigation, as one of Gates's theories at trial had been that the police did not conduct a thorough investigation.

 We have oft stated that to preserve a point on appeal, a proper objection must be asserted at the first opportunity after the matter to which the objection has been made occurs. *Hill v. State*, 337 Ark. 219, 988 S.W.2d 487 (1999)(citing *Jones v. State*, 326 Ark. 61, 931 S.W.2d 83 (1996)). Here, Gates failed to object at the first opportunity when Investigator Strickland mentioned the evidence of the taking of the pubic-hair samples. As such, Gates waived further objections to this evidence.

Third, Gates argues that testimony from Holt prejudiced him because it mentioned rape. At trial, during Holt's direct examination, Holt related statements made to him by Bryan White wherein White said to Holt and Gates that Petty had been raped. Gates objected for hearsay, but the trial court allowed the statement in evidence as it was not offered to prove the truth of the matter asserted, but only to confirm the conversation with White. Notably, Gates concedes in his brief that this ruling was proper. However, at trial, Gates stated that the defense would move for a mistrial if the word "rape" was heard again. Gates, however, did not later move for a mistrial, and, in fact, agreed with the trial court that the prosecutor could lead the witness to avoid any further problems with the objectionable word.

 Gates now asks this Court to consider this exchange at trial, along with the photograph and hair-sample evidence, to overturn the conviction on the basis of their cumulative effect. In order for a cumulative-error argument to be upheld on appeal, the appellant must show that there were objections to the alleged errors individually and that the cumulative-error objection was

made to the trial court and a ruling obtained. *Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998)(citing *Munson v. State*, 331 Ark. 41, 959 S.W.2d 391 (1998)). Appellant's abstract does not reveal that he made a cumulative-error objection at trial and, as such, this issue has not been properly preserved for this appeal. We find no error in the court's rulings.

## Recusal

Gates's final point on appeal involves the recusal of the trial judge, Circuit Judge Lance Hanshaw. Prior to trial, Gates's attorneys filed a motion seeking recusal of the trial judge. The defense based its motion on three facts. First, Lisa Elliot, who discovered Miss Petty's body, is sister to judge Hanshaw's case coordinator. Second, the judge had "expressed pity" for the victim upon hearing of the crime. Third, the Judge knew the father of the victim's daughter-in-law, and the judge had presided over an initial guardianship hearing in a case involving the victim. The trial court held a hearing on this recusal motion on August 11, 1997, at which time the judge denied the motion.

The Arkansas Constitution, Article 7, § 20, as well as the Arkansas Code of Judicial Conduct, Canon 3(c), provide that judges must not preside over cases in which they might be interested and must avoid all appearances of bias. *Trimble v. State*, 336 Ark. 437, 986 S.W.2d 392 (1999)(citing *Matthews v. State*, 313 Ark. 327, 854 S.W.2d 339 (1993)). In addition, there exists a presumption of impartiality. *Turner v. State*, 325 Ark. 237, 926 S.W.2d 843 (1996). A judge is not required to recuse because of his or her life experiences. *Ayers v. State*, 334 Ark. 258, 273, 975 S.W.2d 88 (1998)(citing *Reel, supra*). The decision to recuse is within the trial court's discretion, and it will not be reversed absent abuse. An abuse of discretion can be proved by a showing of bias or prejudice on the part of the trial court. *Turner, supra*; *Trimble, supra*. Furthermore, the party seeking the disqualification bears the burden of proving bias or prejudice on the part of the trial court. *Turner, supra*; *See also Beshears v. State*, 329 Ark. 469, 947 S.W.2d 789 (1997).

A thorough review of the facts of this case reveals no prejudice on the part of the trial court against Gates. The court's order denying the recusal request recites that the court had no contact with the actual witness in the case, that the court's employee had no contact with the facts of the case and was not a potential witness. The mere fact that some rulings are adverse to the appellant is not enough to demonstrate bias. In the absence of demonstrated bias, we cannot say the trial judge abused his discretion in denying Gates's request that he recuse. *Turner, supra.*

The record of the trial has been reviewed in this pursuant to Supreme Court Rule 4-3(h), and no reversible error has been found.

Affirmed.