Arthur E. DICKERSON, a/k/a Bolden  *v.*
STATE of Arkansas

CR 04–1320

214 S.W.3d 811

Supreme Court of Arkansas
Opinion delivered October 6, 2005

*The Law Offices of Ables, Howe & Standridge, PLLC,* by: *J. Brent Standridge,* for appellant.

*Mike Beebe,* Att'y Gen., by: *David R. Raupp,* Sr. Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice. Appellant Arthur Dickerson was convicted by a jury of first-degree murder and sentenced to life imprisonment for the murder of Katherine Pennington. He raises four points for reversal. We reject his arguments, and affirm his conviction.

On March 17, 2003, at around 11:23 p.m., the Fort Smith Fire Department responded to a grass fire at the end of a dead-end street in an industrial part of Fort Smith. As the firefighters extinguished the fire, they discovered the body of Katherine Pennington, who was found nude from the waist down, with a pair of sweatpants lying next to her. The autopsy results indicated that the death was caused by a choke-hold strangulation. The presence of superficial blunt-force injuries on her face and forearm suggested a struggle. The autopsy also indicated that she was dead when the fire started.

Dickerson was arrested and gave a statement, claiming that he had been with Ms. Pennington on March 17, and that they had

consensual sex in his girlfriend's house. He stated that during sex he noticed that he did not hear anything and suddenly realized she was dead. He was scared and did not know what to do, so he put her in the trunk of his girlfriend's car, took her to the industrial area, poured some gasoline on the grass, threw his cigarette on the ground next to her, and drove off. He then went to his job as a certified nursing assistant at the Fort Smith Nursing Center.

Dickerson was charged with capital murder for the death of Ms. Pennington, convicted by a jury of the lesser-included offense of first-degree murder, and sentenced to life imprisonment.

## I. Improper Comments During Closing Argument

For his first point on appeal, Dickerson argues that the trial court erred in denying the motions for mistrial he made during the State's closing arguments. He contends that, during the State's closing argument, the prosecutor improperly commented on his right not to testify at trial. Because this statement allegedly violated his Fifth Amendment privilege against self-incrimination, Dickerson claims that the trial court should have declared a mistrial. We disagree.

A mistrial is an extreme remedy, to be employed only when an error is so prejudicial that justice cannot be served by continuing the trial and when the error cannot be cured by an instruction. *Gates v. State,* 338 Ark. 530, 538, 2 S.W.3d 40, 44 (1999). The decision to grant a mistrial is within the sound discretion of the trial court, and will not be overturned absent a showing of abuse of that discretion or upon manifest prejudice to the complaining party. *Id.* In reviewing whether a mistrial was an appropriate remedy for an allegedly improper comment on a defendant's failure to testify, we review the comments in a two-step process. *See, e.g., Jones v. State,* 340 Ark. 390, 10 S.W.3d 449 (2000).

> First, we determine whether the comment itself is an improper comment on the defendant's failure to testify. The basic rule is that a prosecutor may not draw attention to the fact of, or comment on, the defendant's failure to testify, because this then makes the defendant testify against himself in violation of the Fifth Amendment. A veiled reference to the defendant's failure to testify is improper, as well. Should we determine that the prosecutor's closing argument statement did indeed refer to [the defendant's] choice not to testify, we would then determine whether it can be shown beyond a reasonable doubt that the error did not influence the verdict.

*Id.* at 402, 10 S.W.3d at 456.

We now turn to the prosecutor's statements that Dickerson alleges were improper. Dickerson first points to the following statements made by the prosecutor during his first closing argument:

> The testimony was that he was a certified nursing assistant. He didn't apply C.P.R., he didn't call 9-1-1, and he offered no explanation for the bruise to her neck soft tissue causing ultimate strangulation and death, he offered no explanation for the scratches on her face, he offered no explanation for the more than twenty bruises, abrasions and contusions on her body.

Dickerson also points to the following statements made by the prosecutor in the State's rebuttal closing argument:

> And you know, I've heard over and over the last couple of days this phrase, "rough sex." I've heard that phrase, but you know what I haven't heard? I've *not* heard one single shred of evidence to support the fact that she was consensually engaging in rough sex, not one single shred of evidence. Only two people were there, and the defendant told you in his statement —

The statements from the State's first closing argument neither comment on Dickerson's failure to testify nor constitute a "veiled reference" to his failure to testify. The prosecutor is merely arguing what was not in Dickerson's statement, which was in evidence. That is, in his own statement describing the event, Dickerson "didn't apply C.P.R., he didn't call 9-1-1, and he offered no explanation for" Ms. Pennington's various injuries. Moreover, completely aside from Dickerson's own statement on these issues, Dickerson was not the only witness who could have offered evidence on these matters. The defense neither put on its own experts nor cross-examined the State's experts in order to explain the bruises, scratches, and other injuries to Ms. Pennington. The defense put on no witnesses to state that Dickerson attempted to get help. These were reasonable inferences and deductions that the prosecutor was permitted to argue from the evidence presented and not presented at trial and were not impermissible references to Dickerson's failure to testify. *See, e.g., Echols v. State,* 326 Ark. 917, 975, 936 S.W.2d 509, 539 (1996), *cert. denied,* 520 U.S. 1244 (1997).

Next, the statements from the State's rebuttal closing argument were merely in response to evidence elicited by Dickerson during the trial and statements made by Dickerson's attorney during his closing argument. The State did not bring up the concept of "rough sex" during the trial or in its closing argument. During cross-examination of several of the State's witnesses, however, Dickerson's attorney asked if the witness was "familiar with the term 'rough sex.' " Dickerson's attorney then questioned the witnesses about this concept and whether it could involve choking, strangulation, or pressure on the neck. Then, in his closing argument, Dickerson's attorney again brought up rough sex, by summarizing his cross-examination of the State's witnesses on the subject. He argued that the State's own witnesses admitted that some people engage in "choking, strangulation, beating, bondage, and so forth." He used this testimony to argue that "evidently people may engage in that activity without a deliberate, premeditated purpose of killing anybody."

▇ ▇ Dickerson cannot cross-examine the State's witnesses on this topic, argue it in his closing, and then complain about the prosecutor's rebuttal closing argument that he had "not heard one single shred of evidence to support the fact that she was consensually engaging in rough sex." Dickerson opened the door to the State's comments; he cannot complain about them now. *See Jones, supra.* We hold that the State's comments were not improper comments on Dickerson's failure to testify. Therefore, the trial court did not abuse its discretion in refusing to grant a mistrial.

## II. Testimony of Tabitha Bell

For his second point on appeal, Dickerson argues that the trial court erred in sustaining the State's objection to the testimony of Tabitha Bell involving Ms. Pennington's use of marijuana. Ms. Bell was Ms. Pennington's roommate. The testimony and objection at issue are set forth in relevant part below:

> Q: [DEFENSE ATTORNEY] ... Did you ever personally observe or were you present — did you ever see Kathy abuse any kind of substance?
>
> A: [MS. BELL] Yes, sir.
>
> Q: And what was that?
>
> A: Marijuana.

Q: And how often would she do that?

A: Every chance she got. Mostly, it was every day when I was living with her.

Q: Just about every day?

A: Yes, sir.

Q: Did she abuse any other substance?

A: I've seen her look like she was strung out on meth, but I'm not really for sure if she was or just she got —

PROSECUTOR: Object. Ask to approach.

COURT: That will be sustained. That testimony will be stricken. The jury will be instructed to disregard that testimony.

. . .

[Testimony continued for several pages, and the defense passed the witness.]

PROSECUTOR: Your Honor, can I approach first?

THE COURT: Yes, come up.

PROSECUTOR: Your Honor, the witness testified on direct to something which I, you know, was quite surprised. I mean, she said the victim used marijuana on almost a daily basis, and I want to ask that the Court instruct the jury that that be stricken from the record as well, unless Mr. Beland is going to tell me that his doctor says that is going to be a contributing factor. Otherwise, again, it's just an attempt to smear — it's a negative for everything.

[Counsel and the Court discussed the relevance of the evidence. Defense counsel admitted the defense was not going to put on testimony to connect the marijuana use to Ms. Pennington's death.]

COURT: Well, at this time I'm going to grant the State's motion and strike the testimony as it relates to marijuana as not being relevant.

Dickerson contends that the trial court erred by striking the testimony, not because the testimony was relevant and, therefore, should not have been stricken, but because the State's objection in the trial court was untimely. Dickerson cites several cases for his contention that an objection must be made at the earliest available opportunity or it is deemed abandoned and waived. *See Gates v. State,* 338 Ark. 530, 538, 2 S.W.3d 40, 44 (1999); *Foreman v. State,* 328 Ark. 583, 945 S.W.2d 926 (1997); *Walker v. State,* 313 Ark. 478, 885 S.W.2d 932 (1993). However, these cases hold that an appellant must have made an objection to the allegedly offensive evidence at the first opportunity, not because the *trial court* loses its discretion to rule on the objection, but *in order for an appellant to preserve that point for appeal. Id.*

In the instant case, the State objected to certain testimony during the trial — albeit in an untimely fashion according to Dickerson — and, after argument on both sides, the trial court struck the testimony as irrelevant. Dickerson is appealing. However, he is not appealing the ruling that the evidence was not relevant. He is appealing a point that he never raised in the trial court — that is, that the State's objection to the evidence was untimely. The very cases cited by Dickerson to support his argument bar his appeal on this issue. "To preserve a point on appeal, a proper objection must be asserted at the first opportunity after the matter to which the objection has been made occurs." *Gates,* 338 Ark. at 543, 2 S.W.3d at 47. Dickerson never objected to the timeliness of the State's objection, so the trial court never ruled upon that issue. Failure to obtain a ruling would preclude review even if Dickerson had made a timely objection. *Foreman,* 328 Ark. at 590, 945 S.W.2d at 929. Dickerson has waived this objection, and we are precluded from reaching the merits of his argument.

### III. Motion to Suppress

Next, Dickerson makes three arguments in support of his contention that the trial court erred in denying a motion to suppress his statement. First, he claims that the statement was not the product of a knowing and intelligent waiver of his *Miranda*

rights; second, he argues that the statement was obtained as a result of an unlawful arrest, which was not based on probable cause; and, third, he argues that the statement was obtained as a result of a pretextual arrest.

On March 20, 2003, three days after the victim's body was discovered, Detective Joplin and Detective Smithson of the Fort Smith Police Department went to the apartment of Gracie Roca, Dickerson's girlfriend at the time, and arrested Dickerson. Although Detective Joplin admitted in the suppression hearing that the principal reason for picking up Dickerson was to talk about the Pennington homicide case, the arrest was made pursuant to an arrest warrant for the rape of Jenny Ayers. About five weeks before the Pennington homicide, Ms. Ayers had reported that a man named Arthur had raped her. The police took a rape kit, began investigating the allegations, attempted to meet with Dickerson, and presented the information to the prosecuting attorney's office. No action was taken on the Ayers' case until after the Pennington homicide, at which point a warrant was issued for Dickerson's arrest for the rape of Ms. Ayers.

After the detectives arrested Dickerson, they took him to an interview room at the police station. Detective Smithson advised Dickerson of his *Miranda* rights. The officers testified that Detective Smithson read and explained each right on the *Miranda* form and that Dickerson verbally responded to each one, indicating that he understood his rights. Dickerson then signed his name at the bottom of the form. After Dickerson signed the form, Detective Joplin began questioning him about the Pennington case. Detective Joplin testified that during the explanation of his rights and during the interview, Dickerson was alert and responsive, appeared to understand everything that was asked, responded appropriately, and displayed no peculiar speech or body movement. Both officers testified that there was nothing about Dickerson's speech or demeanor that indicated he did not understand his rights.

Dickerson's expert testified at the suppression hearing that Dickerson read at a fourth-grade level, and that the *Miranda*-rights form required a higher reading level. While she admitted that she did not specifically question him about the form, she opined that, given his reading level, Dickerson would have had difficultly reading and understanding the form. She also testified that Dickerson had mental retardation within the mild impairment range. The State's expert testified that a test he gave to Dickerson suggested his I.Q. was 61. However, he testified that in his

opinion, Dickerson did not put forth effort on the test, was not mentally retarded, and was feigning mental impairment. He stated that during his evaluation of Dickerson, Dickerson was able to converse in a normal fashion, express himself adequately, and discuss the charges against him. He also reviewed letters that Dickerson had written which suggested that he functions at a much higher level than mentally retarded. The expert also noted that Dickerson worked as a certified nursing assistant and, since his evaluation, Dickerson had obtained a minister's license and a driver's license. Upon hearing all of the evidence, the trial court denied the motion to suppress on all grounds.

We defer to the superior position of the trial judge to evaluate the credibility of witnesses who testify at a suppression hearing. *See Flowers v. State*, 362 Ark. 193, 206-07, 208 S.W.3d 113, 124 (2005). Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.*

First, we will address Dickerson's argument that his statement should have been suppressed because his *Miranda* rights were not knowingly and intelligently waived. A statement made while in custody is presumed involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Grillot v. State*, 353 Ark. 294, 310-311, 107 S.W.3d 136, 145 (2003). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, we look to see if the confession was "the product of free and deliberate choice rather than intimidation, coercion, or deception." *Id.* When reviewing the trial court's ruling, we make an independent determination based upon the totality of the circumstances. *Id.* The totality of the circumstances includes the age, experience, education, background, and intelligence of the defendant. *Conner v. State*, 334 Ark. 457, 466, 982 S.W.2d 655, 659 (1998). We will reverse a trial court's rulings on this issue only if it is clearly against the preponderance of the evidence. *Grillot*, 353 Ark. at 312, 107 S.W.3d at 146.

Dickerson argues that because of his low I.Q. and fourth-grade reading level, the trial court should have suppressed the statement as he did not knowingly and intelligently waive his *Miranda* rights. The trial court found that Dickerson was thirty-five

years old, was employed and had been self-sustaining for many years, was married and had children, was familiar with the criminal-justice system, was responsive to the officers, and appeared when advised of his *Miranda* rights to understand them. While Dickerson's expert opined that Dickerson would have had difficulty reading the *Miranda* form, we note that Dickerson did not read the form, Officer Smithson read it to him. Citing our decisions in *Rushing v. State*, 338 Ark. 277, 992 S.W.2d 789 (1999), and *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999), the trial court noted that while a low I.Q. score, age, and mental capacity are factors, standing alone they are not sufficient to suppress a confession. We note also that Dickerson had been advised of and waived his *Miranda* rights in another case both before and after he waived his rights in this case. In both instances, the officer testified that Dickerson appeared to understand his rights and gave no indications to the contrary. The trial court reviewed the evidence and found that Dickerson made a knowing and intelligent waiver of his rights. Following a review based upon the totality of the circumstances, we hold that the trial court's ruling is not clearly against the preponderance of the evidence.

We now address Dickerson's claim that his statement should have been suppressed because police officers lacked probable cause to arrest him. He argues that the officer who obtained the arrest warrant for the Ayers' rape case never actually spoke to Ms. Ayers, but obtained his information from the officer who did investigate the case. Moreover, he argues that several facts in the affidavit were incorrect, including the statement that Dickerson had left his place of employment and his residence. The State argues that Ms. Ayers' allegation of rape against Dickerson is more than enough to establish probable cause, noting that a rape victim's testimony alone can support a conviction. *See Jones v. State*, 348 Ark. 619, 624, 74 S.W.3d 663, 671 (2002)(overruled on other grounds); *Russey v. State*, 336 Ark. 401, 985 S.W.2d 316 (1999).

The trial court found that Ms. Ayers complained of a rape, a rape kit was taken, and officers investigated. Later, while working on the Pennington case, the police discovered Dickerson's criminal history and similarities between the Pennington case and three other rape cases, including the Ayers' case. At this point, the Ayers' arrest warrant was procured. The trial court held that probable cause existed for issuance of the warrant. We agree.

In reviewing the denial of a motion to suppress a statement,

> we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court and proper deference to the trial court's findings.

*Romes v. State*, 356 Ark. 26, 43, 144 S.W.3d 750, 761 (2004). Probable cause exists where there is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious person to believe that a crime has been committed by the person suspected. *Id.* In assessing the existence of probable cause, our review is liberal rather than strict. *Id.* Finally, all presumptions are favorable to the trial court's ruling on the legality of an arrest, and the burden of demonstrating error is on the appellant. *Id.* Having conducted a *de novo* review based upon the totality of the circumstances and giving proper deference to the trial court's findings, we hold that there was probable cause to arrest Dickerson for the rape of Jenny Ayers.

Finally, Dickerson argues that even if there was probable cause to arrest him on the Ayers' case, the arrest was a pretext to get him into custody so police could question him about the Pennington case. Therefore, he claims that his statement in the instant case should have been suppressed. The State does not dispute that the officers in this case obtained the warrant on the basis of the Ayers' case, but that the focus of questioning was on the Pennington homicide. However, the State contends that the arrest was not pretextual because they had probable cause to arrest him for the Pennington homicide, as well as for the Ayers' rape. The trial court agreed with the State.

A pretextual arrest is an arrest that would not have occurred *but for* an ulterior investigative motive. *See State v. Sullivan*, 348 Ark. 647, 655, 74 S.W.3d 215, 221 (2002). We made it clear in *Sullivan* that a pretextual arrest is unreasonable police conduct warranting application of the exclusionary rule. *Id.* However, we have also stated that where there is probable cause to arrest for the greater, more serious offense for which the defendant was convicted, there is no need to determine whether the defendant's arrest on a lesser offense was a pretext. *Romes*, 356 Ark. at 44, 144 S.W.3d at 762. Probable cause exists where there is a reason-

able ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious person to believe that a crime has been committed by the person suspected. *Id.*

■ Officer Holloway, who was involved in the Pennington investigation, testified at the suppression hearing that he determined that Dickerson was the last person to be seen with Ms. Pennington. He also testified that, after making this determination, he began pulling up all of the cases in which Dickerson was a suspect, and determined that all three were similar to the Pennington case. Apparently, Holloway's investigation prompted the warrant in the Ayers' case. Therefore, police knew that Dickerson was a suspect in three similar rape cases and was the last person known to have been with the homicide victim, whose nude body was found dumped and partially burned. Based on our review, which is liberal rather than strict when assessing the existence of probable cause, *Romes, supra,* we conclude that there was probable cause to arrest Dickerson for the Pennigton homicide. Therefore, we affirm the trial court's denial of Dickerson's motion to suppress.

### *IV. Batson Challenge*

Dickerson next argues that the prosecution exercised its peremptory challenges in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986), by striking two African-American jurors. Dickerson claims that the State did not offer sufficiently race-neutral justifications for the challenges, and that he proved that the challenges were exercised with purposeful discrimination. The trial court disagreed and denied Dickerson's *Batson* challenge. This court will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Flowers v. State,* 362 Ark. 193, 204, 208 S.W.3d 113, 122 (2005).

The United States Supreme Court held in *Batson* that a prosecutor in a criminal case may not use his peremptory strikes to exclude jurors solely on the basis of race. *Batson,* 476 U.S. at 89. To do so violates the defendant's rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *Id.* The Court adopted a three-part test for a trial court to use in determining whether a peremptory strike violates the defendant's rights, which we outlined in *MacKintrush v. State,* 334 Ark. 390, 978 S.W.2d 293 (1998):

> (1) the opponent of a peremptory challenge must make a *prima facie* case of racial discrimination; (2) the proponent of the strike must come forward with a race-neutral explanation; and (3) the trial court must decide whether the opponent has proven purposeful racial discrimination.

*Id.* at 397, 978 S.W.2d at 296(citing *Purkett,* 514 U.S. at 767).

We do not address the first step in this case because the parties have rendered it moot. Once the party striking jurors offers a race-neutral explanation under step two and the trial court rules on the ultimate issue of intentional discrimination under step three, the first step of whether a *prima facie* case was shown becomes moot. *Flowers, supra; Holder,* 354 Ark. 364, 379, 124 S.W.3d 439, 450 (2003). Consequently, we turn to step two to determine whether the State's explanations were race-neutral.

The first juror stricken by the State was Ms. Smith. The record reflects that, on the day she was questioned, Ms. Smith attended the funeral of her cousin, Michael Hardwick, who died in the county jail from injuries suffered in a fight with the police. The prosecutor reported that several of Ms. Smith's family members had called his office, alleging that the police were responsible for Mr. Hardwick's death. When asked several times by the prosecutor if she believed the police were responsible for Mr. Hardwick's death, Ms. Smith answered that she did not know. The State felt that her body language during this exchange suggested hostility. The second juror, Mr. Williams, was struck after he indicated that he would have difficultly imposing the death penalty. Mr. Williams elaborated that he also thought the death penalty had been applied discriminatorily toward African-Americans and would "probably not" be able to sign a verdict form imposing the death penalty in this case. The trial court accepted these reasons as race-neutral and proceeded to step three under *Batson.*

Under step three, the ultimate burden of persuasion that there is purposeful discriminatory intent "rests with and never shifts from the party opposing the strikes." *Holder,* 354 Ark. at 381, 124 S.W.3d at 439. In this case, the trial court evaluated the evidence, listened to the parties' explanations, and determined that Dickerson had not proven purposeful discrimination. We cannot say that the trial court's findings were clearly against the preponderance of the evidence. We affirm on this issue.

*V. Rule 4-3(h) Review*

The record in this case has been reviewed for other reversible error pursuant to Rule 4-3(h) of the Rules of the Supreme Court, and no error has been found.

Affirmed.