Cite as 2022 Ark. App. 45

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CR–21–184

| | | |
|---|---|---|
| W.O. (A JUVENILE) | | **OPINION DELIVERED** FEBRUARY 2, 2022 |
| | APPELLANT | |
| | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT |
| V. | | [NO. 04JV-20-355] |
| STATE OF ARKANSAS | | HONORABLE THOMAS E. SMITH, |
| | APPELLEE | JUDGE |
| | | REVERSED |

## ROBERT J. GLADWIN, Judge

W.O. appeals the Benton County Circuit Court's January 21, 2021 adjudication order finding him guilty of second-degree sexual assault. On appeal, he argues that the circuit court erred (1) in finding him guilty of violating the sexual-assault statute because there was no finding that he committed an act for a sexual purpose and (2) by permitting the State to amend the charges. We reverse.

### I. *Standard of Review*

While a delinquency adjudication is not a criminal conviction, it is based on an allegation by the State that the juvenile has committed a certain crime. *B.T. v. State*, 2019 Ark. App. 471, at 6, 588 S.W.3d 387, 392 (citing *A.D. v. State*, 2015 Ark. App. 35, 453 S.W.3d 696). Our standard of review is the same as it would be in a criminal case; that is, whether the adjudication is supported by substantial evidence. *Id*. Substantial evidence is evidence, direct or circumstantial, that is of sufficient force and character to compel a conclusion one way or the

other without speculation or conjecture. *Id*. In considering the evidence presented below, we will not weigh the evidence or assess the credibility of witnesses because those are questions for the fact-finder. *Id*. The evidence is viewed in the light most favorable to the State. *A.W. v. State*, 2017 Ark. App. 34, 510 S.W.3d 811.

## II. *Facts*

The State filed a delinquency petition on July 23, 2020, alleging that W.O., born July 25, 2006, engaged in sexual contact with D.W., a nine-year-old boy, by grabbing D.W.'s genitalia in violation of Arkansas Code Annotated section 5-14-125(a)(5)(A) (Supp. 2021).

A bench trial was held on January 20, 2021, and the State offered two witnesses. Rogers police detective Dustin Wiens testified that he observed D.W.'s interview at the Child Advocacy Center on April 22, 2020. He said that there were allegations of sexual contact, and he spoke with D.W.'s family, who did not corroborate or provide any evidence that contradicted D.W.'s statements. Wiens did not see any signs that indicated concealment during D.W.'s interview, and Wiens said that D.W. was calm and seemed sincere. On cross-examination, Wiens said that he spoke with Elizabeth Hall, D.W.'s aunt and legal custodian, and she indicated she had spoken to D.W.'s grandmother and that they had kept the boys apart. He also interviewed W.O., who denied anything had happened. On redirect examination, Wiens said that he felt like W.O. was not telling him everything and was being very careful of what he was saying. W.O.'s grandfather told Wiens that W.O. has ADHD and that he takes medication for it.

D.W. testified that he is ten years old and that he knows the difference between a truth and a lie. He said that he knows W.O. from church and that W.O. had stayed over at his house on a few occasions. One night when W.O. stayed over, they argued when they competed for

2

the dog's attention, which made D.W. feel sad. W.O. slept in D.W.'s bed, and D.W. slept on the couch. When D.W. woke up that night, he remembered seeing W.O. D.W. testified,

> I felt my private hurting. That is my genitals under my pants. He was grabbing it, squeezing it really hard. It hurt. I told him to move. He did move and went back into my room. He didn't ever talk to me about what had occurred. He pretended like nothing happened.

On cross-examination, D.W. said that when this happened, he and W.O. had gotten into a "fuss" about a dog and that he was afraid W.O. was going to make the dog bite somebody. He said that his aunt and uncle had told him that if the dog bit somebody, it would "go away." He said that he did not tell W.O. to go home because it was really late at night, after dark and after supper. They were mad at each other, and that is why D.W. had slept on the couch. D.W. said that he woke his aunt and told her about the dog, but he did not tell her about "the other thing." He said that he did not tell anyone about it for quite a while. On redirect, he said that the first person he told about the incident was his dad and that he does not know why he waited to tell someone. He said that he has negative feelings about it and that he does not enjoy talking about it. "I was afraid to tell somebody about this, so I waited longer than I needed to."

The State rested its case, and the defense called Elizabeth Hall to testify. She said that she is D.W.'s legal guardian and that she is in the process of relinquishing guardianship because D.W. now lives with his father. She said that D.W. and W.O. had met at church and that they had spent the night together a few times before the incident. She was made aware of the allegation when the police officer came to her door. D.W. had not told her or anyone else about it. She said that the family agreed that D.W. would not be allowed to have any more contact with W.O. She said that she went so far as to talk to someone at the church about

W.O.'s being in contact with other children. She does not remember telling an officer about the boys not having contact and that the families had taken care of it. She remembered telling the officer that D.W. lied a lot. She did not know if she had said that she did not see a reason for the police investigation, but it was possible because everything happened quickly, and she did not know what to do. On cross-examination, she said that D.W. had never lied to her about anything of this nature or importance. She recanted any position that she had taken in the past about whether D.W. was being untruthful "now that she had had time to hear all the evidence." She added that she had been mad at D.W. the morning after the incident because she thought he was being rude to W.O. She said that D.W. did not look at him, he stayed as far away from him in the living room as he could, and he would not speak to him. When W.O.'s grandmother came to pick him up, she told D.W. to tell him goodbye and asked him what was wrong. At the time, she thought D.W. was being rude, but now "his actions have taken on a new light."

W.O. testified that he is fourteen years old and in the eighth grade. He has lived with his grandparents for ten years, and he knows D.W. from church. He said that they had spent the night with each other five or six times and that they had argued at different times. He said that the night they argued about the dog, he got onto the floor and turned on his phone and watched Netflix. He said that D.W. left, so he got back on the bed and fell asleep. He woke up around 8:00 a.m. and went into the living room. Liz, D.W.'s aunt, was there, and he did not know where D.W. was. He said that he did not go into the living room during the night. He said that D.W. was mad at him and that he did not see D.W. before he went home that day.

4

The defense rested its case, and the State made its closing argument. The defense argued in its closing that the incident described was some kind of assault but that it was not sexually motivated. After the State's rebuttal argument, the following colloquy occurred:

THE COURT: Count One that I'm looking at is the sexual assault, second degree, alleging that the victim was under 14, right?

STATE: Yes, Your Honor, that is correct. The—in my closing I confused two alternate theories, there's the forcible compulsion theory, but then there is also the sexual contact by someone who at the time was—on someone who is under the age of 14, and was not a spouse, which I believe the evidence did establish.

THE COURT: Except though, if you look at that part of it, you've got to be 18 years, or older, if I'm reading the statute right. Look at 5-14-125, being 18 years or older engages in sexual contact with a person less than 14, not his spouse. So, in this case it's really the forcible compulsion only, right?

STATE: Yes, Your Honor. And the State would, of course, move to amend that language to be included in our—the actual outline, and we did intentionally bring out that evidence through the course of the trial, and in our closing to lay down the foundation for that—for that finding.

DEFENSE: And, Your Honor, I would object to that. You can't amend your petition after close of evidence. That's a well-established law.

THE COURT: All right. Well, let me sort through this a little bit. The reality of it is, I've heard all of the evidence. I watched the witnesses, listened to the—and judged their credibility. This case is strictly about the credibility. Who do you believe? Do you believe WO, or do you believe DW? I don't—I think right now, when I listened to DW, DW came across as very credible and not lying about any of this. He's upset about it. WO, he's got some—he's got to cover, he's afraid he's going to get in trouble.

Now, I don't agree with the State. I don't think WO was doing this out of some sexual deal, I think whatever got in WO's head that night, being mad or whatever, he did something stupid that 14-year-olds do. And there's a presumption that it's sexual, but I don't think—I don't think that's what the case here is.

5

But WO, my concern here is, that you—I don't believe that you didn't touch DW that night. I don't believe you didn't touch DW that night, and all I want to do is get some help, to make sure that this don't ever happen again.

My concern really is, if I'm correct, and you did, for whatever reason, grab him that night, which I believe by the evidence, not willing to admit it, and tried to lie about it—that is more dangerous than just acting out of whatever. So that's my concern. So, I've got to do something about it. I mean, I think [defense counsel's] right, this is the—sometimes you scratch your head and go what in the world happened? But DW's own testimony was, he woke up, DW said stop, WO stopped, and he left. So, he shouldn't have touched him at all. But when he said stop, you did. All right. But there's another section down here that covers your part of this, I believe.

STATE:              Your Honor, are you referring to subsection (5)(a) of the statute?

THE COURT:          Yeah, I think I was reading (4)(a).

STATE:              And that is correct, Your Honor. Co-counsel and I were reviewing the statute again, and we did identify that subsection (5)(a), where the defendant being a minor engages in sexual contact with another person who is less than 14 years of age, but not the person's spouse.

THE COURT:          Well, the reality of it is, that actually fits—there's a presumption that touching genitals is sexual. It doesn't talk anything about sexual gratification or deviant sexual activity. And what you did, by grabbing him, that's sexual contact. I think it meets the code, and I'm satisfied with that D felony.

I really just want to make sure I get WO in counseling, if he's not already in counseling, just to make sure that as he gets older, don't ever touch anybody or say anything inappropriate, okay? And don't ever have anything on your social media, your computer, your phone, it's all very dangerous. And the older you get, this type of deal can get really, really serious.

The only thing that's concerning me right now is, I don't believe you didn't touch him. I think you're just afraid to get in trouble. I'm not going to lock you up. I'm not going to do that. I'm going to get you some help, and make sure we have some things in place to make sure this never happens again, okay, WO? But be truthful

6

|  |  |
|---|---|
|  | with the counselors when you talk to them and do your counseling, okay? I think WO's been through a lot in life, seems to me like, if I remember right. |
| DEFENSE: | Your Honor, one, I would like to make a record in case WO wants to appeal. I would object to the Court saying that there was not any kind of sexual connotation, and then finding that there was sexual contact. I think sexual contact infers by its definition that there was some type of sexual gratification assault. So, I don't think the State has met its burden on that. |
| THE COURT: | I'm not—I don't think I have to read into his mind. I think the reality of it is, you grabbed somebody's genitals while they're asleep. I think that's what the presumption is. Just because I may not think you planned on doing much more, I don't know. But I think it meets the burden of it. So, I get your record. I'm just saying grabbing the genitals—the case, these facts, are pretty clear. DW was asleep. DW woke up. WO was grabbing his genitals without his permission. DW said stop. WO stopped. WO left. That's it. |
|  | I think it meets the burden of that code. I'll note your objection. But I'm not—I'm not going to sit here and say that WO intended on—I don't know what WO intended on doing. I don't think the State has to prove that. I think there's a presumption, if you're touching somebody's genitals without their permission, that's sexual contact. |
|  | So that's all I'm finding. And the code says that. It doesn't say anything about sexual gratification or deviant sexual activity, if I'm reading this thing right. Under that D felony, I don't read that any of that stuff has to be in place, just sexual contact. |

An adjudication order was filed January 21, 2021, finding W.O. guilty of second-degree sexual assault and ordering that W.O. have no contact with D.W. W.O. filed a timely notice of appeal, and this appeal followed.

### III. *Sexual Contact*

W.O. argues that the circuit court erred in finding him guilty of second-degree sexual assault under Arkansas Code Annotated section 5-14-125(a)(5)(A) because the statute requires

that "sexual contact" be committed for the purpose of sexual gratification, and the court stated that there was no finding that W.O. committed an act for a sexual purpose. Arkansas Code Annotated section 5-14-125 provides that a person commits sexual assault in the second degree if the person, being a minor, engages in sexual contact with another person who is less than fourteen years old and is not the person's spouse. Ark. Code Ann. § 5-14-125(a)(5)(A)(i) and (ii). "Sexual contact" is defined, in part, as an act of sexual gratification involving the touching, directly or through clothing, of the sex organs. Ark. Code Ann. § 5-14-101(12)(A) (Supp. 2021).

W.O. argues that the incident as alleged by D.W. was not committed for the purpose of sexual gratification but was a simple assault. The circuit court stated,

> Now, I don't agree with the State. I don't think W.O. was doing this out of some sexual deal, I think whatever got in W.O.'s head that night, being mad or whatever, he did something stupid that 14-year-olds do. And there's a presumption that it's sexual, but I don't think—I don't think that's what the case here is.

W.O. maintains that while direct proof of sexual gratification is not required, a finding that the purpose of contact was for sexual gratification is required for a court to rule that sexual contact occurred under the statute. *Id.*

Contrary to the State's argument, W.O. contends that this issue is preserved for appellate review. We agree. W.O.'s trial counsel stated,

> I would object to the court saying that there was not any kind of sexual connotation, and then finding that there was sexual contact. I think sexual contact infers by its definition that there was some type of sexual gratification assault. So, I don't think the State has met its burden on that.

To preserve an argument, a proper objection must be asserted at the first opportunity after the matter to which the objection has been made occurs. *Dickerson v. State*, 363 Ark. 437, 444, 214 S.W.3d 811, 817 (2005) (citing *Gates v. State*, 338 Ark. 530, 543, 2 S.W.3d 40, 47 (1999)).

Here, the circuit court had not done anything objectionable until it announced its ruling from the bench. Because W.O. objected at the proper time, this court may address the issue on appeal. *See A.W. v. State*, 2017 Ark. App. 34, 510 S.W.3d 811 (argument not preserved because it was made for the first time on appeal).

W.O. argues that the circuit court erred by finding that the offense need not be committed for the purpose of sexual gratification and stating that the court did not know why or how the offense was committed, yet finding W.O. guilty of second-degree sexual assault. He contends that a finding of intent to commit an act for the purpose of sexual gratification is essential for a finding that sexual assault occurred.

The State argues that the testimony of a sex-crime victim alone is sufficient to support an adjudication. *Brown v. State*, 374 Ark. 341, 288 S.W.3d 226 (2008). Further, when sexual contact occurs without a legitimate medical reason, it can be assumed that such contact was for sexual gratification, and the State need not offer direct proof on that element. *Holland v. State*, 2017 Ark. App. 49, 510 S.W.3d 311. Thus, the State claims that D.W.'s testimony supports the adjudication, and the presumption of sexual contact for the purpose of sexual gratification was never rebutted. *Holland*, *supra*. Further, the State contends that, despite the circuit court's "confusing and contradictory" statements during its ruling, the court concluded that W.O. had violated section 5-14-125(a)(5)(A) and recognized that it had to apply the presumption that W.O. committed the act for the purpose of sexual gratification in determining the truth of the charge.

Regardless of the State's characterization of the circuit court's recognition of the presumption required, we cannot ignore the circuit court's clear finding that W.O.'s actions were not for the purpose of sexual gratification. The circuit court ignored that "sexual contact"

9

is defined as an act of sexual gratification. Ark. Code Ann. § 5-14-101(12)(A). Once the court made its finding of fact that W.O. did not act for the purpose of sexual gratification, it then made an error of law by finding that there was sexual contact based on the presumption. The circuit court's finding that sexual gratification was not proved effectively rebuts the presumption as defined under the statute. *Id*. Accordingly, we reverse.

IV. *Motion to Amend Charge*

Second, W.O. argues that the circuit court erred by permitting the State to amend the charges after both the State and the defense had rested. *See Martinez v. State*, 2014 Ark. App. 182, 432 S.W.3d 689. However, there is no merit to W.O.'s argument because, as evidenced by the colloquy set forth above, the circuit court did not rule on the motion to amend the charge, and the adjudication is based solely on Arkansas Code Annotated section 5-14-125(a)(5)(A)—the charge contained in the delinquency petition.

Reversed.

VIRDEN and WHITEAKER, JJ., agree.

*Laura Avery*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.