James Lee MOORE *v.* STATE of Arkansas

CR 03-424                                                     144 S.W.3d 260

Supreme Court of Arkansas
Opinion delivered January 29, 2004

*Jerome J. Paddock*, for appellant.

*Mike Beebe*, Att'y Gen., by: *David J. Davies*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Appellant James Moore was convicted of two counts of rape, two counts of kidnapping, and one count of residential burglary and sentenced to four consecutive life terms plus twenty-five years in prison. Moore raises two issues on appeal. First, he argues that the trial court erred in denying his motions for directed verdict on the two kidnapping charges. Second, he argues that the trial court erred when it failed to admonish the jury or provide a cautionary instruction regarding the testimony of a police officer.

We find no error and affirm. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (2003).

*Facts*

W.L. and A.C. lived in an apartment located at 821 West Lawson, Number 24, in Fayetteville, Arkansas. A.C. testified that on the morning of April 12, 2002, shortly before six o'clock in the morning, she heard someone knocking on the apartment door. A.C. stated that she could see someone at the window, and she thought the person might be her husband. A.C. testified that she looked out the peephole and did not see anything, so she opened the door. She stated that a man, whom she identified at trial as Moore, stepped in front of her and asked her if someone named Sarah lived there. A.C. told Moore that she did not know anyone by the name of Sarah. Next, she stated that Moore asked her where he could find Apartment 16. A.C. stated that she did not know, and Moore stated: "Okay, thank you."

A.C. returned to a futon where she was sleeping in the living room. She stated that a minute or two later, she again heard a knock at the door. A.C. testified that she got up and looked to see who was at the door and recognized Moore as the person who had previously knocked on the door. A.C. stated that after she opened the door, Moore punched her in the face, and she fell backwards. She testified that Moore then began choking her and telling her to shut up and be quiet. A.C. stated that she continued to struggle with Moore, hoping that W.L. would hear her.

W.L. testified that, on the morning of April 12, she took a shower and after she turned the water off, she heard noises in the apartment. W.L. stated that she put a towel around herself and walked to the door between the bathroom and the bedroom, where she saw A.C. struggling with a man W.L. did not know. At trial, W.L. identified the man as Moore. She stated that Moore was holding A.C. by her hair, tilting A.C.'s head back, and that A.C. was gasping for air. W.L. stated that Moore told her and A.C. to lie down on the bed, and that he did not want to hurt them. Both victims stated that the entire time Moore was in the apartment, he kept asking: "Where is Mike?" They also stated that Moore wanted to know where his $150 was. W.L. and A.C. stated that they told Moore they did not know who Mike was, and that they had no idea where Moore's money was.

A.C. testified that Moore told her to look around the apartment and show him that nobody else was in the apartment. She stated that Moore continued to ask her where Mike was and where his money was, and that he told her he would "beat the fuck

out of them" if they "didn't tell him where he was." A.C. testified that Moore then ordered her and W.L. to take off all their clothes and lie on the bed. Thereafter, Moore ordered A.C. to perform oral sex on W.L. A.C. stated that she attempted to stall, telling Moore that she did not understand what he wanted her to do. W.L. stated that A.C. knelt in front of her and bent forward "like she was going to do it," but "luckily it never got to that point" because Moore allowed A.C. to stop. A.C. offered to go to the ATM and get some money for Moore, and she stated that both she and W.L. pleaded with him to take anything in the apartment. W.L. stated that he debated whether to allow A.C. to go and get some money. A.C. was eventually allowed to put on her clothes.

A.C. stated that around seven o'clock in the morning, the alarm clock on her cell phone went off. A.C. asked Moore if he wanted her to get her cell phone, which was located in the living room, and he told her to go get it. A.C. stated that Moore did not ask her for the cell phone after she retrieved it, so she dialed 911. She stated that she knew that her location could not be traced via her cell phone, so she kept trying to yell out her address.

A.C. returned to the bedroom, and Moore asked her "who she was with," and she provided her husband's name. Then, Moore asked W.L. the same question, and she told him that she did not have a boyfriend. She stated that she believed that her answer made Moore think that she was Mike's girlfriend. W.L. stated that Moore became very angry and slapped her, and she fell back against the bed. Then, Moore poked W.L. in the eye. W.L. testified that Moore eventually stated: "Well, as long as we're waiting here, we're going to have some more fun." Both victims testified that Moore told him that they were going to "suck his dick." W.L. told Moore that she did not want to do that, and he grabbed a vase located in W.L.'s room and said: "Oh, you don't want to do that, do you?" A.C. stated that Moore was beating the vase with his hand. She stated that the vase was very thick, and she feared that Moore could have knocked them out with it, so she turned to W.L. and stated: "[W.L.], just do it." W.L. continued telling Moore that she did not want to do it, but she stated that she eventually performed oral sex on Moore because he had the vase raised above her, and she "felt like he would hit us with the vase if we did not do what he asked." A.C. stated that when W.L. performed oral sex on Moore, the act "didn't last two seconds."

A.C. stated that Moore then forced her to perform oral sex on him and turned back to W.L. and again forced her to perform

oral sex on him. A.C. stated that Moore was beating W.L.'s thighs with the vase, and then he turned to A.C. and told her to insert the vase inside W.L.'s vagina. A.C. stated that she took the vase and tried to hit Moore in the head with it. She stated that Moore got the vase back from her and "immediately got both of us around his stomach and we were both screaming and trying to get away from him." W.L. stated that "all of a sudden it was over," and Moore was walking towards the door. A.C. stated that Moore told her to "come on," so she followed him to the door. W.L. stated that she followed the two for a short time, but since she was still naked, she stopped. Next, A.C. stated that the door was opened, and she saw a blue uniform and knew she was safe.

Officer Rick Logue of the Fayetteville Police Department stated that he responded to a 911 call some time around 7:00 a.m. on April 12, 2002, at the victims' apartment. He stated that as he approached the apartment, he heard lots of screaming and noticed that one of the apartment's window screens was on the ground. Once the door opened, Logue asked Moore to step outside. Logue testified that he noticed that Moore was holding a crystal vase. Logue stated that Moore told him someone inside the apartment had "ripped him off and there were two females inside that were hiding him out." Logue asked A.C. if this was true, and she told Logue that Moore had hit her in the face, knocked her down, and raped her. At this point, Logue placed handcuffs on Moore and placed him under arrest. Logue stated that he noticed redness on A.C.'s neck and cheek. Logue also stated that he noticed that there was another female inside the apartment who was naked.

### Directed Verdict

Moore argues that the trial court erred when it denied his motions for directed verdict on each charge of kidnapping. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* When a defendant challenges the sufficiency of the evidence convicting him, the evidence is viewed in the light most favorable to the State, and only evidence supporting the verdict will be considered. *Id.*

A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty for the purpose of holding him for ransom or reward, or for any act to be performed or not performed for his return or release, or for inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him. Ark. Code Ann. § 5-11-102(a)(1) & (4) (Repl. 1997). "Restraint without consent" includes "restraint by physical force, threat, or deception." Ark. Code Ann. § 5-11-101(2) (Repl. 1997).

■ Moore argues that his conviction on two counts of kidnapping should not stand because the State failed to show that he employed any greater restraint on the victims than that normally incident to rape. In *Lee v. State*, 326 Ark. 529, 932 S.W.2d 756 (1996), this court stated:

> In defining kidnapping, the Criminal Code speaks in terms of restraint rather than removal. The Commentary to this statute explains that the exclusion of *de minimus* restraints from the definition of kidnapping is desirable since offenses such as rape or robbery necessarily contemplate restrictions on the victim's liberty while the crime is actually committed.

> In Arkansas, it is only when the restraint exceeds that normally incidental to the crime that the rapist or robber should also be subject to prosecution for kidnapping. *Summerlin v. State*, 296 Ark. 347, 756 S.W.2d 908 (1988). The kind of restraint that is necessary to consummate rape is that which is necessary to consummate the act. *Harris v. State*, 299 Ark. 433, 774 S.W.2d 121 (1989). Any additional restraint will support a conviction for kidnapping. *Id.* Among the factors that have been considered by courts in determining whether a separate kidnapping conviction is supportable include whether the movement or confinement (1) prevented the victim from summoning assistance; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Frank J. Wozniak, *Annotation: Seizure of Detention for Purpose of Committing Rape Robbery, or Other Offense as Constituting Separate Crime of Kidnapping*, 39 A.L.R. 5th 283, 358 (1996).

*Lee*, 326 Ark. at 533.

In further support of his argument that the trial court erred in denying his motions for directed verdict on the two charges of kidnapping, Moore cites *Summerlin, supra,* and *Shaw v. State,* 304 Ark. 381, 802 S.W.2d 468 (1991). In *Summerlin, supra,* the victim was jogging when she was approached by a nude man holding his penis. The man asked the victim whether she wanted to go for a swim, and she told him that she did not. The victim testified that, as she ran past the man, he came from behind and pulled her to the ground. The man and the victim struggled, and the man held one of the victim's legs and attempted to take off her shorts. While the victim was able to escape, her attacker was charged and convicted of attempted rape and kidnapping. This court reversed the kidnapping conviction, holding that the "restraint used by the appellant did not exceed that normally incident to the crime of attempted rape, and therefore, cannot form the basis for the two separate crimes of kidnapping and rape." *Summerlin,* 296 Ark. at 350-51.

In *Shaw, supra,* the victim voluntarily got into her attacker's vehicle, but was later driven to a dead-end road and raped. This court reversed the kidnapping conviction due to the victim's testimony that she consented to her attacker's actions until the point at which he raped her. *See Shaw,* 304 Ark. at 386.

Moore argues that, in the present case, "the entire nature of the event from the time appellant entered the apartment until he started to leave surrounded sexual activity." We disagree. Unlike the appellants in *Summerlin, supra,* and *Shaw, supra,* in the present case, the restraint employed by Moore was not merely incidental to the rape of the victims.

The evidence at trial indicates that Moore held A.C. and W.L. against their will for approximately forty-five minutes to one hour. After forcing his way into the apartment at around 6:00 a.m., Moore choked A.C., wrestled her into W.L.'s bedroom, and forced W.L. to join A.C. on the bed. Then, Moore forced both W.L. and A.C. to undress. In addition, Moore repeatedly stated, "Where is he? Where is Mike?" and "I want my money." He told A.C. that he would "beat the fuck out of them" if they "didn't tell him where he was." Next, Moore ordered A.C. to perform oral sex on W.L., but stopped A.C. before making her do it.

A.C. offered to go the ATM and get money for Moore, and she testified that both she and W.L. told Moore to take anything he wanted from the apartment. A.C. stated that her alarm clock went off on her cell phone at 7:00 a.m. Shortly thereafter, A.C. placed a 911 call. As the State points out:

It was at this point, sometime after 7:00 a.m., after the 9-1-1 call had been placed, and roughly an hour after he began holding his victims in search of a "Mike," that he forced [A.C.] and [W.L.] to perform oral sex on him. The length of the rapes was short in time. Appellant continued to hold his victims hostage after the rapes were completed.

During the ordeal, Moore threatened, poked, slapped, and hit the victims both with his fist and with a vase. Moore not only raped the victims, but he demanded money from them as well. Under these circumstances, we hold that the restraint employed by Moore exceeded that which was necessary to effectuate the rapes, and thus supported Moore's separate convictions for kidnapping.

*Motion for Mistrial*

Moore argues that the trial court erred when it failed to admonish the jury or provide a cautionary instruction regarding the testimony of a police officer. At trial, Fayetteville police detective Timothy Franklin stated that, at the time of his arrest, Moore's fingerprints were already on file with the Arkansas State Police, thus indicating that Moore had previously been arrested. Subsequently, the following colloquy took place out of the hearing of the jury:

DEFENSE COUNSEL:   Your Honor, I move for a mistrial at this time. He just exposed the fact that my client had a prior record. . . .

PROSECUTING ATTORNEY:   I didn't catch all of the testimony. I heard him say that they have prints on file, that he has an SID number. That's all I heard.

DEFENSE COUNSEL:   He's said anytime a defendant has been previously arrested —

THE COURT:   He did say an arrest, but I don't find that this was purposely done. It was an inadvertent statement. If you want me to admonish the jury about that, I will, but if you would rather me just to ignore it, I'll do that also. I don't think this calls for a mistrial at this point in time.

DEFENSE COUNSEL:   I don't think an admonishment will cure it, Judge.

THE COURT: Well, I don't think just the fact that he's been arrested before — it doesn't indicate anything about his guilt or not. We've been over with this jury the fact that other cases are other cases, and some of these cases where jurors were victims, and I think they clearly understand. There's no connotation even if he's been arrested before on something else doesn't mean he did this. Over your objection, I'm going to deny your motion for a mistrial.

DEFENSE COUNSEL: Thank you.

\*\*\*

■ We have stated that a mistrial is an extreme and drastic remedy which will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when fundamental fairness of the trial has been manifestly affected. *Newman v. State*, 353 Ark. 258, 106 S.W.3d 438 (2003). The circuit court has wide discretion in granting or denying a motion for mistrial, and, absent an abuse of that discretion, the circuit court's decision will not be disturbed on appeal. *Elser v. State*, 353 Ark. 143, 114 S.W.3d 168 (2003). Among the factors we consider on appeal in determining whether or not a trial court abused its discretion are whether the prosecutor deliberately induced a prejudicial response and whether an admonition to the jury could have cured any resulting prejudice. *Jones v. State*, 349 Ark. 331, 78 S.W.3d 104 (2002).

■ In *Jones, supra,* we further stated:

While there is "always some prejudice that results from the inadvertent mention of a prior conviction," *see Strawhacker v. State,* 304 Ark. 726, 804 S.W.2d 720 (1991), this court has upheld denials of mistrials where, by chance remarks, it was brought out that the defendant had prior arrests, and even prior convictions, where the comment was inadvertent. *Cobbs v. State,* 292 Ark. 188, 728 S.W.2d 957 (1987); *see also Novak v. State,* 287 Ark. 271, 698 S.W.2d 499 (1985) (where juror commented during voir dire that he knew the defendant because he had arrested him, the trial court's denial of a mistrial did not require reversal because the evidence of guilt was overwhelming).

*Jones*, 349 Ark. at 338.

Moore argues that "[a]fter indicating he would admonish the jury, the court failed to do so anywhere else in the record." Indeed, the trial court offered to admonish the jury; however, defense counsel rejected the admonishment, stating: "I don't think an admonishment will cure it, Judge."

■ ■ We begin by stating that we disagree with Moore's argument at trial that an admonishment would not have cured any prejudicial error. Detective Franklin's comment about Moore's fingerprints being on file was inadvertent, and the prosecutor was not attempting to elicit testimony concerning Moore's prior arrest. It is clear that the prosecutor was attempting to establish how the fingerprints were gathered at the crime scene and subsequently matched to Moore. Where an admonition to the jury could have cured the situation, but no such admonition is requested (and indeed explicitly rejected), this court will not say that the trial court's decision to deny the mistrial motion was an abuse of discretion. *Jones*, 349 Ark. at 338. Further, we have stated that it is a defendant's duty to request a curative instruction. *Hall v. State*, 314 Ark. 402, 862 S.W.2d 268 (1993). In the present case, no such relief was requested by defense counsel. Moore's failure to request an admonition at trial cannot inure to his benefit on appeal. *Id.*

## *Rule 4-3(h)*

In compliance with Ark. Sup. Ct. R. 4-3(h) (2003), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to the appellant, and no error has been found.

Affirmed.