Ralph ARMSTRONG v. STATE of Arkansas

CR 05-1028                                                      233 S.W.3d 627

Supreme Court of Arkansas
Opinion delivered April 13, 2006

*Terrence Cain*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. Appellant Ralph Armstrong appeals from his two convictions for capital murder and his sentence to life imprisonment without parole. He asserts six points on appeal. We hold that none of the six points raised has merit, and we affirm the judgment of conviction.

Appellant does not challenge the sufficiency of the evidence. Accordingly, we will give only a brief recitation of the facts. *See, e.g., Garcia v. State*, 363 Ark. 319, 214 S.W.3d 260 (2005); *Rollins v. State*, 362 Ark. 279, 208 S.W.3d 215 (2005). On February 14, 2004, the body of Armstrong's estranged wife, Dashunda Armstrong, was found burning in her van on McDonald Road in Pulaski County.[1] She was approximately twenty-weeks pregnant at the time and had been shot at least once prior to burning in the fire.

Pulaski County deputy sheriffs investigated the deaths and discovered that on the previous evening, Dashunda Armstrong had a hair appointment with her sister until around 1:00 a.m. Accord-

---

[1] In the briefs on appeal, the victim is shown as Dashunda Armstrong. However, portions of the record reflect the spelling as Deshaundra Armstrong, DeShunda Armstrong, and DaShunda Armstrong. We will use the spelling in the briefs.

ing to her sister, the victim planned to meet Armstrong after she left the hair salon. When questioned by the investigators regarding his wife, Armstrong responded that she never arrived at his house as they had planned. Further investigation of Armstrong revealed that he had made several cellular telephone calls to a former girlfriend, Kim Waller, on the night of his wife's death. The calls made by Armstrong that evening were made through a cellular tower located near where Dashunda Armstrong's van was found.

Ms. Waller told police that on the evening in question, Armstrong called her sometime after midnight to pick him up not where her sister lived, but the "opposite way . . . down McDonald Road." While she was driving to the area, Armstrong told Ms. Waller that he set "[his wife's] van on fire." When she arrived in the area, Ms. Waller saw the burning van and returned home. Her brother-in-law, Ronnie Neal, who lived in the vicinity, took Armstrong home after Armstrong appeared at his house, request-ing a ride home and smelling of smoke. The next morning, Armstrong told Ms. Waller that he did not have a choice "to do it" because his wife was trying to hurt Ms. Waller and her daughter. A later search of Armstrong's room at his father's home revealed two laptop computers, which included email information from a woman named Adrian Nimmer regarding how to change one's identity. In addition, several letters from various creditors were found. The investigation further revealed an ongoing and conten-tious divorce between Armstrong and his wife.

The State waived the death penalty, and Armstrong was tried on two counts of capital murder, one for the death of Dashunda Armstrong, and one for the death of the twenty-week-old fetus. He was convicted and sentenced as already set forth in this opinion.

## I. Dual Representation

Armstrong first contends that the Model Rules of Profes-sional Conduct prohibited prosecutors from talking to Adrian Nimmer because she was represented by the same attorney as he was. Armstrong claims that the prosecutors had actual knowledge of this and on receiving that notice had an affirmative duty to terminate all communication with her regarding the Armstrong investigation until her counsel informed them that he no longer represented her. Armstrong asserts that it is of no moment that Ms. Nimmer told prosecutors that she was no longer represented by the same counsel because, according to Armstrong, Rule 4.2 of the

Model Rules required the prosecutors to confirm that with the attorney, rather than taking the client's word for it. He further maintains that a referral of the prosecutors to the Supreme Court Committee on Professional Conduct is inadequate to deter such conduct and that the better deterrent would be to exclude the testimony of the witness who was the subject of the Rule 4.2 violation.

A review of the record reveals that Armstrong moved the circuit court to exclude Ms. Nimmer's testimony and asserted that the prosecutors knew she was represented by the same counsel as Armstrong, but talked with her nevertheless. During the discussion before the circuit court on the motion, which the circuit court ultimately denied, the prosecutors represented to the circuit court that no statement was taken from Ms. Nimmer while she was represented by counsel for Armstrong. However, upon her subsequent initiation of contact with prosecutors, she was interviewed. Ms. Nimmer then later wrote a letter to Mr. R. S. McCullough, her former counsel and Armstrong's counsel, stating that she considered his representation terminated when she spoke with the prosecutors.

██ Ms. Nimmer, while not charged in the murders, was in the midst of the investigation between the State and Armstrong after police investigators discovered that she purchased information regarding how to change one's identity for Armstrong. Moreover, the prosecutors knew that she had been represented by the same counsel. But even if this court were to conclude that there was a violation of Model Rule of Professional Conduct 4.2, which we do not, Armstrong has adduced no authority which would have prohibited the prosecutors from using Ms. Nimmer's testimony at trial as a result of that violation. This court does not consider arguments that are unsupported by convincing argument or sufficient citation to legal authority. *See, e.g., McGahey v. State,* 362 Ark. 513, 210 S.W.3d 49 (2005). Because Armstrong does not cite the court to any authority for that proposition, his argument should not be considered.[2]

---

[2] We note that Armstrong cites us to the comment to Rule 4.2 that the rule applies even though the represented person initiates or consents to the communication. That comment, though, is to Rule 4.2 of the Arkansas Rules of Professional Conduct that went into effect on May 1, 2005. *See In Re: Arkansas Bar Ass'n,* 361 Ark. Appx. 451 (2005) (*per*

Furthermore, the Model Rules themselves provide that the "[f]ailure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process." Scope of the Model Rules of Professional Conduct (2004). Thus, were there a violation of Rule 4.2 by the prosecutors in the matter before us, it appears that the appropriate remedy would be disciplinary action and not the exclusion of the statement at issue from the trial. We cannot say that the circuit court erred in admitting Ms. Nimmer's testimony.

## II. Batson

Armstrong next claims that the circuit court erroneously permitted the prosecutors to use their first peremptory challenge to strike Theodore Simpkins, a black male, and their second to strike Delois Hines, a black female.

This court has outlined its three-step procedure for making challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986):

> First, the strike's opponent must present facts to raise an inference of purposeful discrimination; that is, the opponent must present a *prima facie* case of racial discrimination. Second, once the strike's opponent has made a *prima facie* case, the burden shifts to the proponent of the strike to present a race-neutral explanation for the strike. If a race-neutral explanation is given, the inquiry proceeds to the third step, wherein the trial court must decide whether the strike's opponent has proven purposeful discrimination. Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent.

*Hinkston v. State*, 340 Ark. 530, 538-39, 10 S.W.3d 906, 911-12 (2000) (internal citations omitted) (citing *Mackintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998)). With respect to the third stage of the process, this court has held that it is the responsibility of the party opposing the strike to move the matter forward to show purposeful discrimination at that stage to meet the burden of persuasion. *See*

---

*curiam*). The Model Rules of Professional Conduct that were in effect at the time of Armstrong's trial and the comments to those rules did not so provide. That being said, we find the comments to be irrelevant in any event as we conclude that Rule 4.2 does not require the exclusion of evidence in this context.

*Owens v. State*, 363 Ark. 413, 214 S.W.3d 849 (2005). If the party opposing the strike does not present more evidence after the race-neutral explanation is given by the prosecutor, no additional inquiry by the circuit court is required. *See id.*

In reviewing a *Batson* challenge, this court has held that it will reverse a circuit court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *See Stenhouse v. State*, 362 Ark. 480, 209 S.W.3d 352 (2005). It further accords some measure of deference to the circuit court, because it is in a superior position to make determinations of juror credibility. *See id.*

### a. Mr. Simpkins

During *voir dire*, Mr. Simpkins stated that he attended school with Armstrong. Later, the prosecution used one of its peremptory challenges to strike Mr. Simpkins. At that time, Armstrong objected, stating that the prosecution was using one of its strikes against a prospective juror solely because he was black. The prosecution then responded that when asked if he knew any of the people involved, Mr. Simpkins stated that he went to school with Armstrong. The prosecution further pointed to the fact that it had not struck a black female and argued that because of that, Armstrong had failed to meet his burden of proof. The circuit court denied Armstrong's *Batson* challenge. Armstrong's counsel made no further argument and offered no additional proof.

Even assuming that Armstrong made a *prima facie* case to raise an inference of purposeful discrimination, the prosecution clearly provided a race-neutral reason for the strike, which was that Mr. Simpkins knew Armstrong and had previously attended school with him. After the prosecution explained its reason for the strike, the circuit court denied Armstrong's *Batson* challenge. Armstrong's counsel failed to pursue the matter further. We affirm the circuit court on this point.

### b. Ms. Hines

Ms. Hines remarked during *voir dire* that she was due to have surgery on Thursday of that week and that she would have to call to determine whether it could be rescheduled. She further stated that while it would not be an inconvenience for her to reschedule, she did not know about the doctor. She then questioned the prosecutor about why certain facts, such as the color of a car, might

be introduced at trial if it was not important, as the prosecutor had contended. The prosecution used a peremptory challenge to strike her, and Armstrong challenged the strike, arguing that she was a black female who gave no response that would indicate that she was unsuitable for jury selection despite the presence of other black females on the jury.[3] The prosecution responded that other than the fact that she had surgery scheduled for Thursday, which he did not want her to have to reschedule, she and he had gone back and forth about the unimportant details in a case. The prosecutor emphasized to the court that sometimes in criminal cases, not every little detail matches up and that because she seemed to want everything "to mesh" exactly, she might not agree with the prosecution's case. Armstrong countered that an opinion such as Ms. Hines's could be used to determine credibility and that the little matters referenced by Ms. Hines were important. The circuit court denied the challenge.[4]

▮ We hold that the prosecution clearly provided a race-neutral reason for its strike of Ms. Hines. This court has observed that the State's race–neutral explanation must be more than a mere denial of racial discrimination, but need not be persuasive or even plausible. See Stenhouse v. State, supra (citing Purkett v. Elem, 514 U.S. 765 (1995) (per curiam)). See also Rice v. Collins, 546 U.S. 333 (2006) (reiterating that the second step of the Batson process does not demand an explanation that is persuasive or plausible, so long as the reason is not inherently discriminatory). Here, Ms. Hines was scheduled for surgery the week of the trial and, further, had given an indication that she might need all of the testimony presented to match up exactly.

Under step three of the Batson procedure, the ultimate burden of persuasion that there is a purposeful discriminatory intent "rests with and never shifts from the party opposing the strikes." Dickerson v. State, 363 Ark. 437, 450, 214 S.W.3d 811, 821 (2005) (quoting Holder v. State, 354 Ark. 364, 381, 124 S.W.3d 439, 451 (2003)). While Armstrong did argue further after the race–neutral explanation in an attempt to persuade the circuit court that Ms. Hines's opinion was a useful one, the circuit court

---

[3] It is unclear from the record whether one or more black females were currently seated on the jury.

[4] The circuit court did not explicitly deny the challenge; however, it did excuse Ms. Hines.

concluded that counsel had not proven purposeful discrimination. The circuit court's finding on this point was not clearly erroneous.

### III. Prejudicial Testimony

Armstrong next urges that despite a pretrial order prohibiting the mention of blood or a blood-like substance on a tissue found at the crime scene, Lieutenant Eric Holloway of the Pulaski County Sheriff's Office described the evidence during trial as including a tissue with a "reddish substance that was consistent with blood." For this reason, Armstrong claims that the circuit court should have granted his motion for a mistrial. He contends that the prosecution was aware of the court's order and had no excuse for violating it. He points out that the circuit court made a finding that the statement was prejudicial and asserts that the circuit court should have ordered a mistrial due to the brazenness of the violation. In the alternative, he maintains that the circuit court should have held the prosecutors and Lieutenant Holloway in contempt of court for violating the order.

A mistrial is an extreme and drastic remedy which will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. See *Moore v. State*, 355 Ark. 657, 144 S.W.3d 260 (2004). A circuit court has wide discretion in granting or denying a motion for a mistrial, and, absent an abuse of that discretion, the circuit court's decision will not be disturbed on appeal. See *id*. Among the factors this court considers on appeal in determining whether a circuit court abused its discretion in denying a mistrial motion are whether the prosecutor deliberately induced a prejudicial response and whether an admonition to the jury could have cured any resulting prejudice. See *id*.

In the case at hand, the circuit court granted Armstrong's supplemental motion *in limine* to prohibit references to blood where there was no laboratory confirmation of the blood. During Lieutenant Holloway's testimony, Armstrong's counsel approached the bench to confirm that he would not testify in contravention of the court's order regarding any reference to blood.

The following colloquy next ensued between the prosecutor and Lieutenant Holloway:

> PROSECUTOR: Okay. Go ahead. You said you located a black knit cap?

LIEUTENANT HOLLOWAY: Located a cap. It did not appear to be at — you know, there is some traffic that comes through that. I'm familiar with — that it has several people that travel that road throughout the day and night. But it did not appear to be run over. It was right in the middle of the road. It appeared to be fairly, freshly put there. So I decided to package it in a paper sack. Also, I continued on around the east side of the vehicle where I observed a cylindrical pipe that I identified as possibly being a smoking apparatus for crack cocaine. I collected that, and then as I went to the north side of the vehicle, I saw several pieces of what looked to be tissue paper that had a reddish substance that was consistent with blood, I wasn't sure.

Defense counsel objected and the circuit court sustained the objection. Following the arguments of counsel on Armstrong's motion for mistrial, the circuit court denied the motion but gave the following admonition to the jury:

Ladies and gentlemen, prior to the lunch break a witness testified that there was tissue and there was blood that was found on some tissue or a material that looked like blood. I'm advising you that you are to disregard that testimony. I conducted a pretrial hearing and at that hearing I made a determination that — that the substance — the material that was found on that was not blood. And there's no evidence that suggests that there was blood. And therefore, I issued a ruling that that evidence was not supposed to be admitted at trial. The evidence, nevertheless, came out. I think it's irrelevant, so I'm asking that you all disregard that testimony altogether.

In addition, the prosecutor addressed the fact that it was not blood on the tissue as part of the continuing direct examination:

PROSECUTOR: And based upon — along with the Court's ruling here about it. As a matter of fact there was a report confirming that it was not in fact blood that was found on that. Is that correct?

LIEUTENANT HOLLOWAY: That's correct.

PROSECUTOR: And you were aware of this report?

LIEUTENANT HOLLOWAY: Yes.

■ We agree with the circuit court that the statement was not so prejudicial that the fundamental fairness of the trial had been affected. Moreover, the circuit court's admonition to the jury and the prosecutor's subsequent clarification of the matter served to cure any residual prejudice that might have remained. Because the statement was not deliberately elicited by the prosecutor and because the subsequent admonition and clarifying testimony cured any potential prejudice stemming from the statement, the circuit court did not abuse its discretion in denying Armstrong's mistrial motion.

■ With respect to the circuit court's denial of Armstrong's motion for contempt, we view this as a matter that lies within the circuit court's discretion. Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. *See McCullough v. State*, 353 Ark. 362, 108 S.W.3d 582 (2003). The circuit court's failure to hold Lieutenant Holloway in contempt signifies that the circuit court did not believe that the violation of its order rose to the level of contemptuous behavior. We conclude that there was no abuse of discretion by the circuit court.

## IV. Child-Support Arrearage

Armstrong next claims that while it was true that he was behind on his child-support payments, that fact hardly makes it more likely that he committed a double homicide. Hence, he contends that that evidence was irrelevant and should have been excluded. He asserts that even assuming, *arguendo*, that a $784 child-support debt was in some marginal way relevant to the killing of his wife and unborn child, the causal connection between the debt and the killing was so tenuous that any probative value was substantially outweighed by the danger of unfair prejudice to him. Armstrong maintains that despite the prosecution's use of the evidence for the sole purpose of motive, the theory lacked credibility and should not have been heard by the jury.

The admission or rejection of evidence under Arkansas Rule of Evidence 404(b) is left to the sound discretion of the circuit court and will not be disturbed absent a manifest abuse of discretion. *See Swift v. State*, 363 Ark. 496, 215 S.W.3d 619 (2005). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2005).

■ Clearly, evidence of an acrimonious divorce and evidence that Armstrong owed the victim, his estranged wife, back child support could provide a motive for his wife's killing. This court has held that when the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the criminal act may, as a rule, be shown. *See Morgan v. State*, 359 Ark. 168, 195 S.W.3d 889 (2004). Furthermore, the State is entitled to produce evidence showing circumstances which explain the act, show a motive, or illustrate the accused's state of mind. *See id.* The fact that Armstrong had a prior outstanding child-support obligation owed to the victim was certainly relevant in that it provided a possible motive for her murder. For this reason, we cannot say that the circuit court abused its discretion in admitting this evidence.

### V. Third-Party Death Threat

Armstrong also contends that the circuit court erroneously excluded evidence he wanted to present of controversies between Kim Waller and her sisters and the victim, including an audio tape which contained statements by the Waller sisters threatening to kill Dashunda Armstrong. He claims that the circuit court erroneously construed *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993), as requiring that evidence of another's guilt could only be presented where it pointed directly to the other perpetrator's guilt. He asserts that he had the names of all three Waller sisters who had threatened his wife; records of the violent encounters between the women including a court case; records from the prosecutor's office that showed mutual harassment between Mrs. Armstrong and Ms. Waller; and the presence of Kim Waller at the crime scene the night of the murder. He urges that the circuit court trammeled his Fourteenth Amendment right to due process and a fair trial by denying him the opportunity to have the jury decide whether the evidence of Mrs. Armstrong's battles with the Waller sisters cast a reasonable doubt on the prosecution's theory that he perpetrated the murders.

In *Zinger v. State, supra*, this court considered under what circumstances evidence incriminating third parties was relevant to

prove a defendant did not commit the crime charged. Quoting the Supreme Court of North Carolina with favor, this court observed:

> A defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but, such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.

313 Ark. at 75, 852 S.W.2d at 323 (quoting *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988)). This court further quoted the Supreme Court of California with favor, stating:

> [T]he rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

*Id.* at 76, 852 S.W.2d at 323 (quoting *People v. Kaurish*, 52 Cal. 3d 648, 276 Cal. Rptr. 788, 802 P.2d 278 (1990)).

While Armstrong possessed a tape which contained the voices of several Waller sisters threatening Mrs. Armstrong and evidence that Armstrong's wife and several of the Waller sisters had harassed one another, he presented no direct or circumstantial evidence which connected any of the Waller sisters to his wife's death. As the State points out, two of the Waller sisters, Karen and Yolanda, whom their sister Kim identified as being the voices on the tape sought to be admitted by Armstrong, were in Forrest City the night of Dashunda Armstrong's murder, according to Karen's and Kim's testimony presented to the circuit court. In addition, despite Kim Waller's presence in the area of the crime scene the night of the victim's death, Armstrong failed to connect her presence with the possibility of her guilt, especially when she testified that she was only in the area because she received a cellular telephone call from Armstrong to come pick him up.

To be admissible, this court has held that there must be a sufficient connection between the evidence that a third party may have committed the crime and the possibility of another person's guilt. *See Echols v. State*, 326 Ark. 917, 936 S.W.2d 509

(1996). While Armstrong claims that *Zinger* permits evidence of another's *connection* to the crime, he is mistaken. The *Zinger* court was exceedingly clear that any evidence pertaining to the possibility of a third-party's guilt in the crime charged must point *directly* to the guilt of the third party. *See, e.g., Echols v. State, supra.* Because the evidence pointed to by Armstrong does no more than create a suspicion or conjecture that the Waller sisters may have played a role in Dashunda Armstrong's death, the circuit court did not abuse its discretion in rejecting the evidence.

## VI. Nonverbal Conduct

Armstrong claims next that the circuit court erroneously denied his motion for mistrial when the prosecutor stated, during closing argument, that he hoped the jury had watched Armstrong's reaction to the photographs of his dead wife and dead fetus. He claims that the implication is clear that his "reaction," or lack thereof, to the photographs of his wife and unborn child was not sufficiently indicative of his innocence. He asserts that the prosecutor's argument put him in the position of having to explain to the jury that whatever look he had on his face had nothing to do with the prosecution's case against him. He continues that he was prevented from doing so because the statement was made during the prosecution's rebuttal argument. Armstrong submits that the prosecutor crossed the ethical line and constitutional line by commenting on Armstrong's nonverbal conduct during the trial. He maintains that this constituted a veiled reference to his choice not to testify and was improper, unconstitutional, and merits a new trial.

The State answers that Armstrong failed to preserve this point for appeal, but we disagree. During the prosecutor's rebuttal closing argument, the following colloquy took place:

> PROSECUTOR: We're making him out — and what he is and what he's shown you is that he's a cold dispassionate killer. When the photos went up, I hope you watched his reaction to the photos of his dead wife and dead fetus. I hope you took notice of that because it's very important. You know, he talks about the ID —
>
> DEFENSE COUNSEL: That's not in evidence, Judge. That has nothing to do with the case.
>
> PROSECUTOR: Their observation —

DEFENSE COUNSEL: There's no testimony or anything about that at all.

PROSECUTOR: Their observations of him are their observations of him.

THE COURT: Okay. I'll overrule.

In *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999), we held that when the circuit court overrules an objection to the prosecutor's closing argument, it is not incumbent on the defense counsel to go forward and move for a mistrial. In other words, the issue is preserved if the objection is made, and the objection is overruled. Here, that is precisely what happened. Accordingly, we will address the merits of this point.

We conclude that the prosecutor's comment was not reversible error. The prosecutor merely directed the jury to recall Armstrong's reaction to the photographs of his dead wife and fetus. This court has held that the prosecution is limited in its argument to the evidence in the record, logical inferences and deductions therefrom, and matters of which judicial notice can be taken. *See Parker v. State*, 265 Ark. 315, 578 S.W.2d 206 (1979). We have further held that the circuit court has a very broad latitude of discretion in supervising and controlling the arguments of counsel, and its ruling is not subject to reversal unless there is a manifest, gross abuse of that discretion or the matter complained of is a statement of the attorney's opinion made only to arouse the passion and prejudice of the jury. *See id.*

With respect to comments regarding a defendant's demeanor or appearance, the Ohio Supreme Court has held that a defendant's face and body are physical evidence and that it is permissible for the prosecution to comment on the accused's physical appearance. *See State v. Lawson*, 64 Ohio St. 3d 336, 595 N.E.2d 902 (1992). *But see State v. Smith*, 91 Haw. 450, 984 P.2d 1276 (1999) (outlining a variety of jurisdictions' holdings on the subject, both proper and improper).

Where a prosecutor is alleged to have made an improper comment on a defendant's failure to testify, this court reviews the arguments in a two-step process. *See Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). First, the court determines whether the argument itself is an improper comment on the defendant's failure to testify. *See id.* The basic rule is that a prosecutor may not draw

attention to the fact of, or comment on, the defendant's failure to testify, because this then makes the defendant testify against himself in violation of the Fifth Amendment. *See id.* A veiled reference to the defendant's failure to testify is also improper. *See id.* Should the court determine that the prosecutor's closing argument did indeed refer to the defendant's choice not to testify, the court then determines whether it can be shown beyond a reasonable doubt that the error did not influence the verdict. *See id.*

In the instant case, we cannot say that the prosecutor's reference to Armstrong's reaction was a direct or even a veiled reference to his failure to testify. Hence, we find no reversible error on this point and affirm the circuit court.

The record in this matter has been reviewed for other reversible error in accordance with Supreme Court Rule 4-3(h), and none has been found.

Affirmed.