Albert Kieth SMITH *v.* STATE of Arkansas

CR 06-77                                     239 S.W.3d 494

Supreme Court of Arkansas
Opinion delivered September 21, 2006

[Rehearing denied November 2, 2006.]

*Joel W. Price*, for appellant.

*Mike Beebe*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

BETTY C. DICKEY, Justice. Albert Kieth Smith appeals his conviction of forty years for one count of kidnapping, and life without parole for one count of capital murder, from the Benton County Circuit Court. He alleges multiple errors by the circuit court, which include: (1) failing to dismiss for want of jurisdiction or failing to submit the jurisdiction issue to the jury; (2) failing to direct a verdict in favor of Appellant based on the insufficiency of the evidence; (3) permitting the State to impermissibly shift the burden of proof to Appellant; (4) failing to properly instruct the jury with regard to the evidence that was not admitted for the truth of the matter; and, (5) permitting the State to introduce prior "bad acts." We conclude that his appeal is without merit, and affirm.

## Background

On September 18, 1999, the body of an unidentified white man was found in McIntosh County, Oklahoma, in the right-of-way of Interstate 40. The body was positively identified on September 20, 1999, as that of David Douglas Howard. Howard had been shot in the back of the neck, and two .22 caliber bullets were recovered from his body. Howard was a fifty-six year old, single man who had lived in Bella Vista and managed the Loch Lomond Marina. Appellant's involvement with Howard is best understood by reviewing, in a chronological order, Smith's relationship with his wife, Linda, in the months preceding the crimes.

Linda Smith had been married to Albert Kieth Smith for twenty-eight years, and, according to Linda, their marriage had become "platonic." She and Smith had their own computers, and Linda began looking at online websites on hers after learning about them from her daughter. In June of 1999, Smith and Linda decided to separate; however, for financial reasons, they continued living in the same house in Van Buren.

With the help of a co-worker and friend, William Dunn, Smith installed a program on Linda's computer that kept track of her keystrokes so that he could access the password to her AOL email account. Although they were separated, Smith was upset about Linda's communication with other men, and, at some point in the summer of 1999, he printed twenty to twenty-five emails involving communication between Linda and other men. Smith

took those emails to Mikeal Bates, who was a detective in the Criminal Investigation Division at that time. Bates looked at the emails and listened as Smith told him that he had put the Stealth program on Linda's computer in order to view her computer activity. Smith asked Bates to speak with Linda and tell her to stop emailing other men, whereupon Bates suggested marriage counseling to Smith.

On July 19, 1999, Smith set up an email account using the alias "jccart." Smith not only told Dunn about this account, but Dunn saw the name jccart as it appeared on several of the emails he had written Linda. Not only Linda received emails from a jccart account, but also Herbert Hawkins, one of the men with whom Linda had chatted online, received an email on July 22, 1999, from a jccart account warning him to stay away from Linda Smith. The Stealth Keyboard Interceptor Program installed on Linda's computer would, without her knowledge, send Smith's computer copies of every email that she sent or received. Smith filed for divorce on July 29, 1999. Although surprised when Smith filed for divorce, Linda accepted the situation and moved out of the house she shared with Smith on August 13, 1999.

There were two other men besides Hawkins with whom Linda Smith frequently exchanged emails, Robert Glendinning of Jacksonville, Florida, and David Howard, the victim in this case. The evidence suggests that Smith was trying to gather information on these men. Linda testified that Smith had a Sam's card and would buy pre-paid phone cards. She admitted that they occasionally shared the phone cards while she lived with Smith, but testified that she did not use them after she moved out. The evidence shows that calls were placed from Smith's calling card in an attempt to track down Mr. Glendinning. A call was also placed from that calling card to the Loch Lomond Marina, where David Howard was employed. In addition, internet searches for Robert Glendinning's address were entered on Smith's computer.

In an email exchange on August 10, 1999, Linda and David Howard discussed meeting one another. That same day, Linda received emails from the jccart account mentioning Howard. One email read, "How about David is he going to be more competition for me," and the other stated, "Maybe I don't have the right to be jealous, but I am anyway. I hope you don't start anything with David." Linda was still unaware that the jccart account had been registered on Smith's computer, thinking jccart was a stranger on the internet who had somehow hacked into her computer. She

received another email from jccart on August 11, 1999, stating "I will try to stop monitoring your email account, although it will be hard to do knowing all of your other friends."

While Smith was not a hunter and did not collect guns, his Visa was used to purchase a Marlin .22 caliber rifle, with scope and ammunition, at the Van Buren Wal-Mart on August 11, 1999. The next day, a call was placed from Smith's new cell phone to the Loch Lomond Marina, and Linda received an email from the jccart account regarding Howard coming to stay with her on Sunday night and Monday. The email warned her that Howard was out every night with a different woman and that she should use a condom to be safe. On August 14, 1999, Smith's work records from his job as a mail carrier for the U.S. Postal Service revealed that he took the day off. His Visa was used on that day for purchases from the Rogers Wal-Mart, and the purchases included a pair of binoculars, black jeans, a black long-sleeve shirt, and a pair of black shoes. A call was placed that night from Smith's cell phone to Howard's home phone number in Bella Vista.

On August 15, 1999, Linda and Howard met in person for the first time, and he spent that night at her apartment. Smith's work records for that day indicate that he had the day off, and his computer later revealed that he had spent time that day researching different poisons. During this time period Linda was still communicating with Robert Glendinning, the man from Florida. Smith's computer also revealed that he emailed Glendinning on August 17, 1999, stating that "there is more at stake here than you can imagine." In addition, Smith's Visa records indicate more purchases at the Van Buren Wal-Mart, including a one-half inch white nylon rope. Two days later, August 19, 1999, Smith purchased a new white van, although his truck was fairly new with low mileage. The van's license plate read 535DMK.

David Howard and Linda decided that she should visit Howard at his home in Bella Vista on August 21, 1999. Smith's work records show that he again took a sick day on the same day, and his cell phone records reveal that calls were made to Howard's place of employment. The calls to the Loch Lomond Marina were connected through the nearest cell tower, indicating that the calls were placed from Bella Vista. That night, Smith's Visa revealed a purchase of a nine-and-a-half inch stainless steel knife at the Van Buren Wal-Mart, and Smith's calling card showed three calls were placed to Howard's home.

On August 23 and 25, 1999, Smith again took leave from work. His Visa records indicate that he rented a car at Hertz in Fort Smith on August 23, 1999, and that he made a purchase from the Exxon in Little Rock on August 24, 1999. Later that day, the license tag on Smith's van, 535DMK, was run by law enforcement authorities in Greenville, Mississippi, and Smith's Visa records revealed a purchase at the Exxon in Loxley, Alabama. Smith went to Jacksonville, Florida, where Robert Glendinning lived. His calling card showed another call to Howard's home in Bella Vista on August 24. On August 25, Smith's Visa was used at a Chevron station in Baldwin, Florida, and his calling card was used from a pay phone at the Hardee's in Neptune Beach, Florida, to call Robert Glendinning. Smith finally reached him, but could not convince Glendinning to meet him.

Linda and David Howard made plans for another date at Howard's home in Bella Vista on August 26, 1999. On August 27, Smith missed another day at work, and on that same day, rented a car from the Hertz location in Springdale. In addition, several phone calls were placed from his cell phone indicating that he was in the Rogers, Bentonville, and Bella Vista area. Two calls were made to Loch Lomond Marina, and calls were also placed to Howard's home. Smith took a sick day at work on August 30, 1999, and, that same day, he ordered the book, "How to Make a Silencer for a .22." The book was to be shipped to an Albert Smith in Van Buren. Smith ordered eight more books pertaining to gun silencers on September 1, 1999. The order called for overnight delivery. On that same day, a call was again placed to Howard's home from Smith's cell phone, going through a cell tower in Bella Vista, indicating that the call originated from there. On September 2, 1999, another call from Smith's phone to Howard's home was placed, this time from the north Fort Smith area. The same day, David Howard drove to visit Linda and spent the night at her apartment.

On September 3, 1999, Smith was not working and rented another car from Hertz. More calls from Smith's phone to Linda suggest that Smith was in the Bella Vista area. Three days later, on Monday, September 6, 1999, calls were placed on Smith's calling card from the All In 1 Market, located near the Sonic in Bella Vista. Smith's phone also indicated a three-minute phone call to Howard's home at 5:19 p.m. At 6:28 p.m., Howard sent Linda an email regarding their plans for the upcoming weekend. He informed her that he had "run into complications for Saturday

night" and had been "offered a job opportunity" and needed to "be back in Bella Vista by 7 p.m. on Saturday night." Linda and Howard spoke about the email later and Linda testified that he was supposed to meet someone near the Sonic in Bella Vista. Howard told her that he had been contacted by a man named Billy Martin, whom he believed to be a recruiter for people who wanted Howard to build a new marina in an undisclosed location. Bill Dunn testified that he and Smith actually had worked with a postal carrier named Billy Martin, indicating that Smith knew an actual person by that name.

Smith told Linda that he planned to travel on Saturday, September 11, 1999, and would not return until September 17. Smith rented another car from the Springdale Hertz location on September 10, and on September 11, he placed two calls on his calling card. One call placed him in Springdale at 6:46 p.m., and the other placed him in Seminole County, Oklahoma, at 10:51 p.m.. Finally, at 1:18 a.m. on September 12, Smith again used his calling card, placing a call from Marietta, Oklahoma. Several of Howard's communications relayed that he traveled a similar route that night when he was with the recruiter, whom he knew as Billy Martin. Linda spoke with Howard on Sunday, September 12, and testified that he had been very frustrated as something had gone wrong with his trip. However, he informed Linda that he intended to get back with the recruiter at a later date. The evidence indicated that Howard had also been seeing other women and that he had shared his belief with them, as well as Linda, that building a marina was a future business opportunity for him.

On September 12, 1999, Smith told Linda, his son, and his daughter-in-law that he was about to do some traveling to Mississippi with a girlfriend, Rebecca. However, nobody ever saw Rebecca or even believed that she existed. What is known is that Smith bought a new computer at Best Buy in Fort Smith and then charged a room at the Howard Johnson Motel in North Little Rock on his Visa later that same day. The next day, September 13, 1999, a Ruger .22 pistol and ammunition were purchased from Midsouth Guns and charged to Smith's Visa. Smith called his friend Bill Dunn when he had trouble getting his computer to work, and, after speaking with Dunn, he was able to get the computer hooked up to the Internet from his motel room. On September 14, 1999, searches for information on silencers and poisons were entered on this new computer.

Around the same time, Howard called two people in an attempt to get information on a white van with an Arkansas license plate of 535DMK. Chief Wozniak of the Bella Vista Sheriff's Office testified that Howard asked him to run the tag because he had seen a white van around the marina. However, Chief Wozniak told him that he could only run checks for law enforcement purposes. Layla Wheeler testified that Howard had also asked her to run that very same tag. Wheeler was told that Howard wanted the tags run because he was being recruited by someone to build a marina, but the individual would not give him a company name and would not reveal much about himself, except to say he was driving a company car. Howard wanted to see to whom the car was registered. Layla Wheeler finally ran the tags for him, but it was after Howard had been murdered.

Smith checked out of the Little Rock Howard Johnson Motel on September 15, 1999, and saw his chiropractor in Fort Smith the same day. That afternoon, Howard left work at the Loch Lomond Marina. At 5:45 p.m., he emailed Linda Smith for the last time, informing her that he was to meet the recruiter at six o'clock at the Sonic in Bella Vista and would probably be gone for several hours. Investigators later found a notepad at Howard's house beside his computer, with a few notes jotted on it, "Billy Martin, marina, build, license number of car, AR535DMK, meet six o'clock Allen's parking lot by Sonic, one hour away 9/15/99." Days later, Howard's Blazer was towed away from where it had been parked near the Sonic.

On September 16, 1999, the day after Howard was to meet the recruiter, Smith called Linda and informed her that he was back in town. Linda was worried about Howard because she had not heard from him. Smith offered to bring dinner to Linda's home. When she allowed Smith to come, he kept telling her that he was tired and had taken a sleeping pill. Smith fell asleep on the floor and Linda decided to leave him there and went to her bedroom to go to sleep. Linda's computer records indicate that at 4:22 a.m. on September 17, the Stealth program that had been monitoring her computer activity was deleted and was sent to the recycle bin of her computer. Linda awoke around 6:30 a.m., and Smith was already up and about to leave her apartment. Linda attempted to contact Howard but was unsuccessful, and, that same day, he was reported missing by a co-worker. On September 18, 1999, the body of David Howard was discovered in Oklahoma. On January 22, 2004, more than four years later, Smith was

arrested and charged in Benton County, Arkansas, with the capital murder and kidnapping by deception of David Howard.

### Sufficiency of the Evidence

Smith contends that the trial court erred by not granting his motion for a directed verdict, and challenges the sufficiency of the evidence supporting his convictions. More specifically, he alleges that the evidence was merely circumstantial and did not exclude every other hypothesis consistent with his innocence.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Cluck v. State,* 365 Ark. 166, 226 S.W.3d 780 (2006). We have repeatedly held that, in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

Although Smith did not raise his sufficiency challenge until the second point on appeal, double jeopardy considerations require this court to consider it first. *See Johnson v. State,* 366 Ark. 8, 233 S.W.3d 123 (2006); *Standridge v. State,* 357 Ark. 105, 161 S.W.3d 815 (2004); *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003). However, as noted by the State, Smith did not make a proper directed-verdict motion. The following motion was made to the court at the close of the State's case:

> We move for a directed verdict on insufficiency of the evidence. On the whole the evidence is too speculative and too conjectural to submit to the jury. As you know, a jury should decide the case only on the hard facts and all we have here is speculation masquerading us back and conjectural masquerading us back and theory masquerading us back, so we would move for a directed verdict.[1]

At the close of the trial, Smith renewed his motion as follows:

> Our directed verdict motion we premised much upon the same thing. That is, if the court doesn't bounce this for jurisdiction, then

---

[1] Appellant abstracted the three phrases "us back" to read "as fact," which makes more sense in context; however, it is not how the record reads. (R. 4533)

the court should look at the state of evidence and again acknowledge that insufficient evidence was presented insofar as the kidnapping is concerned, because the evidence that the judge did admit was admitted with the admonition that it is not being offered for the truth [of] the matter. We once again have a situation where there is no affirmative evidence that the alleged kidnapping occurred. . . . I would incorporate everything said on the jurisdiction argument into our motion for directed verdict and to dismiss for insufficiency of the evidence.

. . . .

[T]here is no evidence of a kidnapping or murder for this jury to consider and it would be allowing the jury to speculate and base their verdict on speculation and conjecture.

. . . .

Judge, for the purpose of the record, we would reiterate and incorporate our previous motions word for word and line for line for everything that has been said in our written motions previously filed, as well as our motions presented at the initial end [*sic*] of the State's case, at the end of our case, and we would incorporate all of those, and without belaboring, I would just like to incorporate them by reference.

▋ Where a motion for directed verdict is made, Arkansas Rule of Criminal Procedure 33.1 requires that it specifically state how the evidence is deficient. *See* Ark. R. Crim. P. 33.1(a). Rule 33.1 further provides that the failure of a defendant to challenge the sufficiency of the evidence at the times *and in the manner* required by the rule will constitute a waiver of any question pertaining to sufficiency of the evidence. *See* Ark. R. Crim. P. 33.1(c) (emphasis added). Smith's motion was improper, in that "[a] motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense." Ark. R. Crim. P. 33.1(c). The motion must specifically advise the trial court as to how the evidence was deficient. *Nelson v. State*, 365 Ark. 314, 229 S.W.3d 35 (2006); *Pyle v. State*, 340 Ark. 53, 8 S.W.3d 491 (2000). The reason underlying this requirement that specific grounds be stated and that the absent proof be pinpointed is that it allows the circuit court the option of either granting the

motion, or, if justice requires, allowing the State to reopen its case to supply the missing proof. *See Webb v. State*, 327 Ark. 51, 938 S.W.2d 806 (1997). This court has repeatedly held that it will not address the merits of an appellant's insufficiency argument where the directed-verdict motion is not specific. *See Nelson, supra*; *See Davis v. State*, 330 Ark. 501, 956 S.W.2d 163 (1997). Smith's directed-verdict motion was a surface objection insufficient to preserve the argument for appeal. Therefore, we will not address the merits of the sufficiency argument.

## Jurisdiction

Smith contends that the trial court erred in failing to dismiss for want of jurisdiction or for failing to submit a jury instruction, proffered by Smith, that would have instructed the jury that the State bore the burden of proving jurisdiction beyond a reasonable doubt. Smith's main objection is that the evidence is insufficient to prove that the murder took place in Arkansas, especially considering that the body of David Howard was discovered in Oklahoma. In addition, Smith argues that the issue of jurisdiction should not be determined by a trial court, but that the State should have to prove jurisdiction beyond a reasonable doubt to the satisfaction of a jury.

The Arkansas Criminal Code instructs that jurisdiction is one of four elements that must be proven beyond a reasonable doubt to convict someone of an offense. *See* Ark. Code Ann. § 5-1-111(a) (Repl. 2006). However, Ark. Code Ann. § 5-1-111(b) creates a presumption in favor of jurisdiction where the charge is actually filed by the State. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). Section 5-1-111(b) states:

> (b) The state is not required to prove jurisdiction or venue unless evidence is admitted that affirmatively shows that the court lacks jurisdiction or venue.

Before the State is required to put on evidence to prove jurisdiction, there must be positive evidence that the offense occurred outside the jurisdiction of the court. *Findley v. State*, 307 Ark. 53, 818 S.W.2d 242 (1991). In the instant case, there was only evidence that the body was found in Oklahoma. There was no positive evidence presented that the crime actually occurred outside of Arkansas. In addition, this court has said that any state in

which an essential part of the crime is committed may take jurisdiction, as it is not essential that all of the elements of the crime charged take place in Arkansas. *Id.* The record in this case provides ample substantial evidence that, at the very least, the premeditation and deliberation element of capital murder, *see* Ark. Code Ann. § 5-10-101(a)(4) (Repl. 2006), or the act of kidnapping by deception, *see* Ark. Code Ann. § 5-11-101(3) and § 5-11-102(a)(4) (Repl. 2006), occurred in Arkansas. Therefore, we conclude that this argument has no merit.

## Burden of Proof

Smith contends that the trial court erred by allowing unredacted custodial statements made by Smith into evidence. He argues that in doing so, the court allowed the State to impermissibly shift the burden of proof to him. The particular statements Smith is opposing are comments that were made in response to his being asked by investigators how he could convince them that he is not guilty with the evidence they had against him. Smith contends that with those statements being admitted, the State was able to shift the burden of proof to him to prove his innocence.

While Smith is correct in that he may not be expected to disprove his guilt, this court does not find that the admission of Smith's custodial statements had the effect of shifting the burden of proof. In fact, the trial court correctly instructed the jury that the State had the burden of proof beyond a reasonable doubt, and that Appellant was not required to prove his innocence. While a statement made in custody is presumptively involuntary, the State must prove that it was given voluntarily and was knowingly and intelligently made in order for it to be admissible. *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005). Smith is not arguing that a waiver of his *Miranda* rights was by intimidation, coercion, or deception. While Smith could have remained silent, he chose to speak with the investigators and his statements were admissible, like any other evidence, as pieces of the puzzle that might help the jury determine Smith's guilt or innocence. For these reasons, we conclude that this argument is without merit.

## Jury Instructions

Appellant contends that the trial court erred in failing to instruct the jury with regard to evidence that was not admitted for the truth of the matter asserted. Several evidentiary items were

admitted in trial that were offered for reasons other than the truth of the matter asserted. A number of these exhibits required an admonishment to the jury for the evidence to be considered for purposes other than the truth of the matter asserted. Smith admitted that the court did admonish the jury at the time that the exhibits were introduced. However, he now argues on appeal that the trial court erred by not instructing the jury again at the conclusion of the evidence. First, this argument was not supported by case law in Appellant's brief. An argument unsupported by convincing argument or authority, whose merit is not apparent without further research, cannot support reversal. *See Hathcock v. State*, 357 Ark. 563, 182 S.W.3d 152 (2004). Secondly, as noted by the State, jurors are presumed to comprehend and follow the instructions given to them by the court. *Kelly v. State,* 350 Ark. 238, 85 S.W.3d 893 (2002). Smith has not made a convincing argument that the court erred by not giving certain instructions more than once. For these reasons, this court rejects this argument.

### Prior Bad Acts

For his last point on appeal, Smith argues that the trial court erred in permitting the State to introduce certain testimony and certain items found in his home. He contends that the evidence consisted of "prior bad acts" that should have been excluded by the court under Rule 404(b) of the Arkansas Rules of Evidence, and that the evidence possessed no similarity to the crimes for which he was convicted. The State argues that the court did not abuse its discretion by admitting evidence: that Appellant possessed a brief case that contained a map of the Southeastern United States, a rope, and a knife; that he went to Florida where one of his ex-wife's internet contacts lived; and that the contact from Jacksonville, Florida, Robert Glendinning, had received email about Linda Smith by a person with a jccart account name.

The admission of evidence under Arkansas Rule of Evidence 404(b) is left to the sound discretion of the circuit court and will not be disturbed absent a manifest abuse of discretion. *Armstrong v. State,* 366 Ark.105, 233 S.W.3d 627 (2006). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2006). Howard, the victim in the case, had been a friend of Smith's ex-wife whom she met on the internet. Evidence that Smith had contacted Glendinning, another contact of his ex-wife, to discourage a relationship with Linda, that he had traveled to Florida, and possessed rope and a knife in a brief case with a map of the Southeastern United States could be indicative of Smith's intent, motive, or planning regarding the men his ex-wife had befriended. This court has held that, when the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003). Furthermore, the State is entitled to produce evidence showing circumstances that explain the act, show a motive, or illustrate the accused's state of mind. *Armstrong, supra.* (citing *Morgan v. State,* 359 Ark. 168, 195 S.W.3d 889 (2004)). For this reason, we find that the circuit court did not abuse its discretion in admitting this evidence.

## Rule 4-3(h)

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Smith. No prejudicial error was found.

Affirmed.